JUDGE PRESKA

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **SIEMENS BUILDING TECHNOLOGIES, INC.** a Delaware Corporation,<br><br>          Petitioner,<br><br>                    v.<br><br>**JULES KROLL**, an individual and **BARD PARTNERS II, LLC**, a Colorado limited liability company,<br><br>          Respondents. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |



07  CV No.  **10332**

**PETITION TO CONFIRM ARBITRATION AWARD**



NOV 14 2007
U.S.D.C.S.D.N.Y.
CASHIERS

Petitioner, Siemens Building Technologies, Inc. ("SBT"), by and through its undersigned counsel, for its petition against respondents Jules Kroll, an individual and Bard Partners II, LLC alleges as follows:

1.      Petitioner SBT is a Delaware Corporation with its principal place of business in Buffalo Grove, Illinois.

2.      Respondent Jules Kroll ("Kroll") is an individual residing in New York, New York.

3.      Respondent Bard Partners II, LLC ("Bard") is a Colorado Limited Liability Company with its principal place of business in Evergreen, Colorado (Bard and Kroll are sometimes collectively referred to as the "Respondents").

4.      Both Kroll and Bard were Respondents in the New York, New York arbitration proceedings in which SBT obtained the Arbitration Award it seeks to confirm through this motion.

5.      The matter in controversy as to each Respondent exceeds $75,000.00 exclusive of

1

interest and costs.  This Court may exercise jurisdiction pursuant to 28 U.S.C. Section 1332 (a)(1).

6.    Venue is proper in this district pursuant to 28 U.S.C. Section 1391(a)(1) because Kroll resides in this District.

7.    Pursuant to Section 6 of the Federal Arbitration Act ("FAA"), this Motion for Confirmation of the Final Award is being made as a motion to be "heard in the manner provided by law for the making and hearing of motions." 9 U.S.C. § 6.

8.    On June 8, 2001, SBT entered into an Agreement and Plan of Merger (the "Agreement") to acquire Security Technologies Holding Corporation (the "Company") from the Company's stockholders, convertible note holders and option holders (the stockholders and convertible note holders are collectively referred to as "Stockholders").  A true and correct copy of the Agreement is attached hereto as Exhibit A.

9.    The deal closed and the merger became effective on July 16, 2001 (the "Effective Time").  Each of the Stockholders received a cash payment from SBT based on their percentage ownership of the Company at the time of the closing.

10.    SBT and the Stockholders explicitly anticipated that certain taxes incurred by the Company prior to Effective Time would be paid by SBT after the closing.  As a result, the Agreement included an indemnification clause (Section 7.2) which required the Stockholders to reimburse SBT for such taxes as well as all professional fees and other expenses incurred in connection with those taxes or SBT's enforcement of its indemnification rights under the Agreement.

11.    Section 7.7 of the Agreement provides that, following an attempted resolution of the dispute through a face-to-face meeting, any party may submit the dispute to binding arbitration to the New York, New York office of the American Arbitration Association ("AAA")

in accordance with the procedures set forth in the Commercial Arbitration Rules of the AAA, revised and effective July 1, 1996.

12.     Section 7.7 (d) further provides:

> The Commercial Arbitration Rules of the AAA, revised and effective July 1, 1996, as modified or revised by the provisions of this Section 7.7, shall govern any arbitration proceeding hereunder. The arbitration shall be conducted by three arbitrators selected pursuant to Rule 13 of the Commercial Arbitration Rules, and pre-hearing discovery shall be permitted if and only to the extent determined by the arbitrator to be necessary in order to effectuate resolution of the matter in dispute. The arbitrator's decision shall be rendered within 30 days of the conclusion of any hearing hereunder and the arbitrator's judgment and award may be entered and enforced in any court of competent jurisdiction.

13.     On or about July 14, 2004, SBT notified the Stockholders' Representative, Steven Sharpe, that it was entitled to be indemnified by the Stockholders for various tax payments, professional fees and other costs and expenses pursuant to Section 7.2 of the Agreement (the "Indemnification Claim").

14.     From that time through June 2005, SBT and the Stockholders' Representative engaged in an informal exchange of information in an attempt to resolve the Indemnification Claim.

15.     Thereafter, despite SBT's many requests, the Stockholders refused to participate in the face-to-face meeting contemplated by Section 7.7.

16.     Accordingly, on July 7, 2005, SBT filed a demand for arbitration with the AAA seeking damages from the Stockholders based on its Indemnification Claim.

17.     In order to limit costs, the Stockholders waived their right to insist on three arbitrators and entered into an agreement with SBT to submit the Indemnification Claim to a single arbitrator (the "Waiver Agreement"). A true and correct copy of the Waiver Agreement is attached hereto as Exhibit B.

18.    Thereafter, pursuant to the Agreement, Richard Jeydel (the "Arbitrator") was chosen by SBT and the Stockholders to conduct the arbitration herein.

19.    On July 10, 2007, the Arbitrator rendered a Final Award in writing, a copy of which is attached hereto as Exhibit C and incorporated herein by this reference. The Award provides:

> each of the individually named respondents, in the percentages shown severally and not jointly for each below (hereinafter referred to collectively as "RESPONDENTS"), shall pay Siemens Building Technologies, Inc. (hereinafter referred to as "CLAIMANT"), the sum of $1,057,513.39, plus interest on that sum at the rate of six per cent (6%) per annum from May 17, 2007 until paid. Award at ¶ 1.

20.    The Award further provides that the administrative fees and expenses and the compensation for the arbitrator shall be borne severally by Respondents in the percentages shown in the Award and that Respondents shall reimburse SBT the sum of $16,491.00, representing that portion of said fees and expenses previously incurred by SBT. See Award at ¶ 2.

21.    Pursuant to the Award, Kroll is liable for 48.51432% of the total Award, costs, fees and continuing interest and, therefore, must pay SBT $513,045.43, plus interest on that sum at the rate of six percent (6%) per annum from May 17, 2007 until paid, plus $8,000.50 in arbitration fees and costs.

22.    Pursuant to the Award, Bard is liable for 9.46937303% of the total Award, costs, fees and continuing interest and, therefore, must pay SBT $100,139.89, plus interest on that sum at the rate of six percent (6%) per annum from May 17, 2007 until paid, plus $1,561.59 in arbitration fees and costs.

23.    The Final Award was made in accordance with the terms and provisions of the parties' Agreement and is in all respects proper.

24.    The Arbitrator served a signed copy of the award on Petitioner on July 11, 2007.

4

25.    To date, the Final Award has not been vacated, modified or corrected, and no application has been made to the arbitrator for the same.

26.    This Petition for confirmation is brought within one year after the arbitrator made the Final Award.

### III.  PRAYER FOR RELIEF

**WHEREFORE** Siemens Building Technologies, Inc. respectfully requests that the Court:

a.    grant its Petition to Confirm the Arbitration Award entered in AAA Arbitration No. 50-180-T-00275-05;

b.    enter a judgment against Jules Kroll in the amount of $513,045.43, plus interest on that sum at the rate of six percent (6%) per annum from May 17, 2007 until paid, plus $8,000.50 in arbitration fees and costs;

c.    enter judgment against Bard Partners II, LLC in the amount of $100,139.89, plus interest on that sum at the rate of six percent (6%) per annum from May 17, 2007 until paid, plus $1,561.59 in arbitration fees and costs; and

d.    grant all such further relief that the Court deems just and necessary.

Dated: November 8, 2007

Respectfully Submitted,

SCHNADER HARRISON SEGAL & LEWIS LLP

By: _____

Bruce Strikowsky (BS-8791)
Robert M. Greenawalt (RG-1325)
140 Broadway, 31st Floor
New York, NY 10005
Telephone:  (212) 973-8000

THOMPSON COBURN LLP D/B/A
THOMPSON COBURN FAGEL HABER
David M. Rownd (IL No. 06207951)
James L. Oakley (IL No. 6280737)
55 E. Monroe Street, Suite 4000
Chicago, IL 60603
Telephone:  (312) 346-7500
Facsimile:  (312) 580-2201

*Attorneys for Petitioner Siemens Building Technologies, Inc.*

**A**

[EXECUTION COPY]

AGREEMENT AND PLAN OF MERGER

BY AND AMONG

SIEMENS BUILDING TECHNOLOGIES, INC.,

OCTANE ACQUISITION CORP.

AND

SECURITY TECHNOLOGIES HOLDING CORPORATION,

THE STOCKHOLDERS

PARTY HERETO

AND THE STOCKHOLDERS'

REPRESENTATIVE IDENTIFIED

HEREIN

Dated as of June 8, 2001

732491.25.01

# TABLE OF CONTENTS

PAGE

**ARTICLE I    THE MERGER; ADDITIONAL ACTIONS.** ........................................................ 2

Section 1.1.    The Merger. ................................................................................... 2
Section 1.2.    Effective Time. .............................................................................. 2
Section 1.3.    Closing. ......................................................................................... 2
Section 1.4.    Effects of the Merger. .................................................................... 2
Section 1.5.    Certificate of Incorporation, By-Laws and Officers and Directors of the Surviving Corporation. ............................................... 2
Section 1.6.    Further Assurances. ....................................................................... 3

**ARTICLE II    CONVERSION OF SHARES.** .............................................................. 3

Section 2.1.    Conversion of Capital Stock. ........................................................ 3
Section 2.2.    Closing Statement Procedures. ..................................................... 7
Section 2.3.    Payment of Funds at and following the Closing. ........................... 8
Section 2.4.    Payment for Certificates and Options. .......................................... 9
Section 2.5.    Payment of Certain Debt to Stockholders. .................................. 11

**ARTICLE III    REPRESENTATIONS AND WARRANTIES OF THE COMPANY.** .................. 11

Section 3.1.    Organization. ............................................................................... 11
Section 3.2.    Capitalization. ............................................................................. 11
Section 3.3.    Authority. .................................................................................... 13
Section 3.4.    No Conflicts; Governmental Requirements. .................................. 15
Section 3.5.    Subsidiaries. ................................................................................ 15
Section 3.6.    Books and Records. ..................................................................... 16
Section 3.7.    Financial Statements. ................................................................... 16
Section 3.8.    Absence of Undisclosed Liabilities. .............................................. 17
Section 3.9.    Operations and Obligations. ......................................................... 17
Section 3.10.    Properties. .................................................................................. 19
Section 3.11.    Accounts Receivable; Accounts Payable; Inventory. ................... 21
Section 3.12.    Contracts. ................................................................................... 22
Section 3.13.    Project Backlog. .......................................................................... 24
Section 3.14.    Litigation. ................................................................................... 25
Section 3.15.    Compliance with Law; Authorizations. ........................................ 25
Section 3.16.    Intellectual Property. .................................................................. 25
Section 3.17.    Tax Matters. ............................................................................... 27
Section 3.18.    Employee Benefit Plans. .............................................................. 29
Section 3.19.    Employee Compensation. ............................................................ 30
Section 3.20.    Employees. .................................................................................. 31
Section 3.21.    Environmental Laws. ................................................................... 32
Section 3.22.    Insurance. ................................................................................... 32
Section 3.23.    Bank Accounts, Letters of Credit and Powers of Attorney ........... 33
Section 3.24.    No Adverse Development. ............................................................ 33
Section 3.25.    Transactions with Affiliates. ........................................................ 33
Section 3.26.    Relationship with Customers and Suppliers. ................................. 33
Section 3.27.    Brokers. ...................................................................................... 34
Section 3.28.    Absence of Questionable Payments. ............................................ 34
Section 3.29.    Product Liability. ......................................................................... 34
Section 3.30.    Disclosures. ................................................................................. 35

ARTICLE IIIA  REPRESENTATIONS AND WARRANTIES OF THE STOCKHOLDERS. ............................. 35
  SECTION 3A.1.  OWNERSHIP ................................................................ 35
  SECTION 3A.2.  AUTHORITY ................................................................ 36
  SECTION 3A.3.  NO CONFLICTS; GOVERNMENTAL REQUIREMENTS ....................... 37
  SECTION 3A.4.  BROKERS .................................................................. 37
  SECTION 3A.5.  KNOWLEDGE ............................................................... 38

ARTICLE IV     REPRESENTATIONS AND WARRANTIES OF SBT AND ACQUISITION. .................. 38
  SECTION 4.1.  ORGANIZATION ............................................................. 38
  SECTION 4.2.  CORPORATE AUTHORITY. .................................................. 38
  SECTION 4.3.  NO BREACH. ............................................................... 38
  SECTION 4.4.  BROKERS. .................................................................. 39
  SECTION 4.5.  FINANCING. ................................................................ 39

ARTICLE V      COVENANTS AND ADDITIONAL AGREEMENTS. ........................................ 39
  SECTION 5.1.  CONDUCT OF BUSINESS. ................................................... 39
  SECTION 5.2.  NO SOLICITATIONS. ....................................................... 42
  SECTION 5.3.  ACCESS TO INFORMATION; CONFIDENTIALITY. ......................... 42
  SECTION 5.4.  MEETING OF STOCKHOLDERS. ............................................ 43
  SECTION 5.5.  REGULATORY AND OTHER APPROVALS. ................................... 44
  SECTION 5.6.  NOTICE AND CURE. ....................................................... 44
  SECTION 5.7.  COMPANY STOCK PLAN. ................................................... 45
  SECTION 5.8.  TERMINATION OF CONTRACTS. ........................................... 45
  SECTION 5.9.  FULFILLMENT OF CONDITIONS. ........................................... 45
  SECTION 5.10.  ADDITIONAL COVENANTS AS TO CONVERTIBLE NOTES. .................. 45
  SECTION 5.11.  ADDITIONAL AGREEMENTS OF STOCKHOLDERS. .......................... 46
  SECTION 5.12.  LESSOR LETTERS. ....................................................... 46
  SECTION 5.13  ADDITIONAL FINANCIAL STATEMENTS. ................................... 47
  SECTION 5.14.  EMPLOYEE AGREEMENTS. ................................................. 47

ARTICLE VI     CONDITIONS TO CLOSING. .............................................................. 47
  SECTION 6.1.  CONDITIONS TO THE OBLIGATIONS OF SBT AND ACQUISITION. ........ 47
  SECTION 6.2.  CONDITIONS TO THE OBLIGATIONS OF THE COMPANY. .................. 49

ARTICLE VII    SURVIVAL; INDEMNIFICATION; TAX MATTERS. ...................................... 50
  SECTION 7.1.  SURVIVAL. ................................................................. 50
  SECTION 7.2.  INDEMNIFICATION .......................................................... 50
  SECTION 7.3.  LIMITATION OF LIABILITY; DISPOSITION OF ESCROW FUND. ........... 52
  SECTION 7.4.  STOCKHOLDERS' REPRESENTATIVE. ...................................... 52
  SECTION 7.5.  NOTICE OF CLAIMS. ...................................................... 53
  SECTION 7.6.  DEFENSE OF THIRD PARTY CLAIMS. ..................................... 53
  SECTION 7.7.  DISPUTE RESOLUTION: NEGOTIATION, MEDIATION AND ARBITRATION. .. 54
  SECTION 7.8.  EXCLUSIVE REMEDY. ..................................................... 55
  SECTION 7.9.  TAX MATTERS. ............................................................ 55

ARTICLE VIII   TERMINATION; EFFECT OF TERMINATION. ........................................... 56
  SECTION 8.1.  TERMINATION. ............................................................. 56
  SECTION 8.2.  EFFECT OF TERMINATION. ............................................... 56

ARTICLE IX     FEES AND EXPENSES. .................................................................... 57
  SECTION 9.1.  EXPENSES. ................................................................. 57
  SECTION 9.2.  STOCKHOLDERS OF THE COMPANY. ...................................... 57

Exhibit A       Form of Certificate of Incorporation of Surviving Corporation

Exhibit B       Form of By-laws of Surviving Corporation

Exhibit C       Directors and Officers of Surviving Corporation

Exhibit D       Form of Closing Statement

Exhibit E       Form of Release

Exhibit F       Form of Employment Agreement

Exhibit G       Opinion of Company's Counsel

Exhibit H       Opinion of SBT's and Acquisition's Counsel

Exhibit I       Escrow Agreement

# AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of June 8, 2001, by and among SIEMENS BUILDING TECHNOLOGIES, INC., a Delaware corporation ("SBT"), OCTANE ACQUISITION CORP., a Delaware corporation ("Acquisition"), and SECURITY TECHNOLOGIES HOLDING CORPORATION, a Delaware corporation (the "Company"), the stockholders, option holders and holders of convertible notes of the Company and such Persons holding securities exercisable for or convertible into shares of capital stock of the Company that are signatories hereto (the "Stockholders"), and the Stockholders' Representative identified herein.  Certain capitalized terms used in this Agreement have the meanings ascribed to them in Article X.

## RECITALS

A.  The Company is a Delaware corporation, with its principal executive office located at 1601 Sawgrass Corporate Parkway, Suite 400, Sunrise, Florida 33323.

B.  SBT is a Delaware corporation, with its principal offices located at 1000 Deerfield Parkway, Buffalo Grove, Illinois 60089.  Acquisition is a wholly-owned direct subsidiary of SBT and was formed to merge with and into the Company (the "Merger") so that, as a result of the Merger, the Company will survive and become a wholly owned subsidiary of SBT.

C.  The respective Boards of Directors of SBT, Acquisition and the Company have approved this Agreement and determined that this Agreement and the consummation of the Merger in accordance with the laws of the State of Delaware and subject to the terms and conditions of this Agreement, is advisable and in the best interests of SBT, Acquisition and the Company, respectively, and, in the case of Acquisition and the Company, their respective stockholders and have approved this Agreement.

D.  The Stockholders (i) have simultaneously herewith executed written consents in accordance with Section 228 of the General Corporation Law of the State of Delaware (the "DGCL") with respect to their shares of common stock, par value $.01 per share, of the Company ("Company Common Stock"), held by them, approving of the Merger and adopting this Agreement in accordance with Section 251 of the DGCL and (ii) agree to vote against and oppose any Acquisition Transaction with any third party; (iii) agree to provide all notices and perform all actions necessary for the consummation of the transactions contemplated herein; and (iv) agree to waive their appraisal rights with respect to the Merger and the other transactions contemplated hereby under Section 262 of the DGCL with respect to all shares of Company Common Stock held by such Stockholder or their Affiliates, including any shares of Company Common Stock issuable upon the conversion or exercise of options and convertible securities held by them.

E.  SBT, Acquisition, the Company and the Stockholders desire to make certain representations and warranties, covenants and agreements in connection with the Merger and also to set forth the terms and conditions of the Merger, all as set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto intending to be legally bound do hereby agree as follows:

## ARTICLE I     THE MERGER; ADDITIONAL ACTIONS.

Section 1.1.     The Merger.  At the Effective Time, upon the terms and subject to the conditions of this Agreement, Acquisition shall be merged with and into the Company in accordance with the provisions of the DGCL.  The Company shall be the surviving corporation in the Merger (the "Surviving Corporation").  As a result of the Merger, all of the respective outstanding shares of capital stock of the Company and Acquisition shall be converted or cancelled in the manner provided in Article II.

Section 1.2.     Effective Time.  At the Closing, a certificate of merger (the "Certificate of Merger") shall be duly prepared and executed by the Surviving Corporation and thereafter delivered to the Secretary of State of the State of Delaware (the "Secretary of State") for filing, as provided in Section 251 of the DGCL, on, or as soon as practicable after, the Closing Date. The Merger shall become effective at the time of the filing of the Certificate of Merger with the Secretary of State, or at such later time as may be agreed by SBT and the Company and stated in the Certificate of Merger (the date and time of such filing (or stated later time, if any) being referred to herein as the "Effective Time").

Section 1.3.     Closing.  The closing of the Merger (the "Closing") shall take place at the offices of Dechert, 1717 Arch Street, 4000 Bell Atlantic Tower, Philadelphia, Pennsylvania at 10:00 a.m., local time, on the second business day following the date on which the conditions set forth in Article VI shall have been satisfied or, if permissible, waived in accordance with this Agreement, or on such other date, time and place as the parties may mutually agree (the "Closing Date").  At the Closing there shall be delivered to SBT, Acquisition and the Company the certificates and other documents and instruments required to be delivered under Article VI, and SBT shall deposit the funds and make the other payments required by Article II.

Section 1.4.     Effects of the Merger.  At the Effective Time, the effects of the Merger shall be as provided in the applicable provisions of the DGCL.

Section 1.5.     Certificate of Incorporation, By-Laws and Officers and Directors of the Surviving Corporation.

(a)     The certificate of incorporation of the Company, as in effect immediately prior to the Effective Time, shall be amended in the Merger so as to read in its entirety as set forth in Exhibit A and, as so amended, shall be the certificate of incorporation of

the Surviving Corporation until thereafter amended as provided by law and such certificate of incorporation.

(b)    The by-laws in the form set forth in Exhibit B shall be the by-laws of the Surviving Corporation until thereafter amended as provided by law, the certificate of incorporation of the Surviving Corporation and such by-laws.

(c)    From and after the Effective Time, the directors and officers of the Surviving Corporation shall be as set forth on a schedule to be delivered by SBT at the Closing and attached as Exhibit C hereto, until their respective successors are duly elected and qualified or until their earlier death, resignation or removal in accordance with the Surviving Corporation's certificate of incorporation and by-laws.

Section 1.6.   Further Assurances.  Each Party hereto shall execute such further documents and instruments and take such further actions as may reasonably be requested by one or more of the others to consummate the Merger, to vest the Surviving Corporation with full title to all assets, properties, rights, approvals, immunities and franchises of Acquisition and the Company or to otherwise effect the purposes of this Agreement.

## ARTICLE II   CONVERSION OF SHARES.

Section 2.1.   Conversion of Capital Stock.  At the Effective Time, by virtue of the Merger and without any further action on the part of any Stockholder or any holder of capital stock, Options or Convertible Notes of the Company:

(a)    Capital Stock of Acquisition.  Each issued and outstanding share of the common stock, par value $.01 per share, of Acquisition ("Acquisition Common Stock") shall be converted into and become one fully paid and nonassessable share of common stock, par value $.01 per share, of the Surviving Corporation ("Surviving Corporation Common Stock"). Each certificate representing outstanding shares of Acquisition Common Stock shall at the Effective Time represent an equal number of shares of Surviving Corporation Common Stock.

(b)    Cancellation of Treasury Stock and Stock Owned by SBT and Acquisition.  All shares of capital stock of the Company that are owned by the Company as treasury stock and any shares of Company Common Stock owned by SBT or Acquisition or by any direct or indirect wholly-owned subsidiary of SBT or Acquisition automatically shall be cancelled and shall cease to exist and no consideration shall be delivered in exchange therefor.

(c)    Conversion of Company Capital Stock.

(i)    Each issued and outstanding share (each a "Share") of Company Common Stock (other than shares to be cancelled in accordance with Section 2.1(b) and other than shares that are Dissenting Shares (as defined in Section 2.1(d)) shall be converted into the right to receive an amount per share in cash (such per share amount, the "Merger Price") equal to the quotient of (x) the Adjusted Acquisition Price divided by (y) the number of shares of

- 3 -

Company Common Stock that are issued and outstanding on a fully diluted basis (assuming the exercise or conversion of any securities exercisable or convertible into shares of Company Common Stock, including the Convertible Notes and the Options) immediately prior to the Effective Time (the "Fully Diluted Share Amount"). All such shares of Company Common Stock shall no longer be outstanding and shall be cancelled automatically and shall cease to exist, and each holder of a certificate representing any such shares of Company Common Stock shall cease to have any rights with respect thereto, except the right to receive the Merger Price, subject to the terms of the Escrow Agreement and Sections 2.1(c)(ii) and (iii), upon the surrender of such certificate (or other evidence of ownership reasonably acceptable to SBT) in accordance with Section 2.4, without interest.

The aggregate amount of merger consideration to be paid by SBT is EIGHTY-FIVE MILLION DOLLARS ($85,000,000) (the "Acquisition Price"), subject to the aggregate downward adjustments described in this Section 2.1(c). For purposes of calculating the Merger Price and the Initial Payments on a fully diluted per share basis, the term "Adjusted Acquisition Price" shall be equal to (i) the Acquisition Price, plus (ii) the amount equal to the sum of the aggregate per share exercise prices or purchase prices of each Option in respect of which a Cash Payment is required to be made pursuant to Section 2.1(e), minus (iii) the Closing Debt Amount, minus (iv) the amount, if any, by which the Working Capital Amount exceeds the Estimated Closing Date Working Capital (the "Initial Working Capital Adjustment"), (v) plus the amount of any Post-Closing Adjustment Amount required to be paid by SBT to the Stockholders' Representative pursuant to Section 2.2(e) and minus the amount of any Post-Closing Adjustment Amount required to be paid by the Stockholders' Representative to SBT pursuant to Section 2.2(e), minus (vi) the amounts, if any, distributed to SBT out of the Escrow Amount, and minus (vii) except as is otherwise included in clause (v) of this Section 2.1(c)(i), the portion of the Stockholders' Representative Expense Amount paid or retained by the Stockholders' Representative pursuant to clauses (x), (y) and (z) of Section 2.1(c)(iii). It is agreed by the Parties that the amount described in clause (ii) of the preceding sentence is included in the definition of the Adjusted Acquisition Price solely for the purpose of calculating the Merger Price and the Initial Payments on a fully diluted per share basis and is not an amount actually paid by SBT. Schedule 2.1(c)(i) sets forth, for illustrative purposes, a hypothetical calculation of the Adjusted Acquisition Price.

(ii)    FOUR MILLION, TWO HUNDRED FIFTY THOUSAND DOLLARS ($4,250,000) of the Acquisition Price (the "Escrow Amount") shall be deposited into escrow pursuant to the terms of the Escrow Agreement. In accordance with the terms of the Escrow Agreement, following completion of the Escrow Period, the Escrow Agent shall distribute the Remaining Escrow Balance to the holders of shares of the Company Common Stock immediately prior to the Effective Time and holders of Options entitled to receive a Cash Payment in the proportion that the aggregate number of shares of Company Common Stock (assuming the exercise of all Options) held by such holder immediately prior to the Effective Time bears to the Fully Diluted Share Amount.

(iii)    A portion of the Acquisition Price (the "Stockholders' Representative Expense Amount") to be determined by the Company and the Stockholders' Representative shall be paid to the Stockholders' Representative for the purpose of (x) paying the amounts reflected in the Invoices (or as otherwise contemplated by Section 9.1) and any other expenses that the Company or the Stockholders incur in connection with the negotiation, preparation and performance of this Agreement and the transactions contemplated hereby; (y) paying the amounts described in Sections 2.2(d) and 2.4(d), if any; and (z) paying expenses in connection with his performance of the duties of Stockholders' Representative (including his duties under Section 2.2); provided that the Stockholders' Representative shall deliver an undertaking to the Company and to SBT pursuant to which he will agree to pay the amounts set forth in clauses (x), (y) and (z) and deliver to the Escrow Agent any portion of such amount not utilized for such purpose, which portion shall be distributed to the holders of shares of Company Common Stock who are holders of record immediately prior to the Effective Time and holders of Options entitled to receive a Cash Payment in the proportion that the aggregate number of shares of Company Common Stock (assuming the exercise of all Options) held by such holder immediately prior to the Effective Time bears to the Fully Diluted Share Amount, which proportions shall be set forth in Schedule 2.1(c)(iii), which shall be prepared and delivered by the Company to the Stockholders' Representative and to SBT at the Closing.  Five business days prior to Closing, the Stockholders' Representative shall deliver a calculation of the Stockholders' Representative Expense Amount to SBT, together with the Invoices and all other documentary support for the amounts included in the Stockholders' Representative Expense Amount to the extent then available, and the Stockholders' Representative shall deliver to SBT any additional Invoices and similar documentary support at such later times as they may become available. Each Stockholder waives any claim it may have against SBT, Acquisition, the Company, the Surviving Corporation or any of their respective Subsidiaries or the Indemnified Parties of each of them, (A) with respect to the Stockholders' Representative Expense Amount (once such amount is delivered to the Stockholders' Representative) or any transactions, arrangements or understandings that are contemplated by this Section 2.1(c)(iii) to be provided for in the Stockholders' Representative Expense Amount, (B) any distributions of the Stockholders' Representative Expense Amount and (C) the conduct of, and actions taken or not taken by, the Stockholders' Representative in respect of the Stockholders' Representative Expense Amount, and the Parties agree and acknowledge that SBT, Acquisition, the Company, the Surviving Corporation and their respective Subsidiaries and the Indemnified Parties of each of them shall have no liability to any Person therefor.

(d)    Dissenting Shares.  Notwithstanding any provision of this Agreement to the contrary, each outstanding share of Company Common Stock the holder of which has not voted in favor of or consented to the Merger, has perfected such holder's right to an appraisal of such holder's shares in accordance with the applicable provisions of the DGCL and has not effectively withdrawn or lost such right to appraisal (in each case a "Dissenting Share"), shall not be converted into or represent a right to receive the Merger Price, but rather the holder thereof shall be entitled only to such rights as are granted by the applicable provisions of the DGCL; provided, however, that any Dissenting Share held by a Person at the Effective Time who shall, after the Effective Time, withdraw the demand for appraisal or lose the right of

- 5 -

appraisal, in either case pursuant to the DGCL, shall be deemed to be converted into, as of the Effective Time, the right to receive the Merger Price, subject to the terms of the Escrow Agreement and Sections 2.1(c)(ii) and (iii). The Company shall give SBT (x) prompt notice of any written demands for appraisal, withdrawals of demands for appraisal and any other instruments served pursuant to the applicable provisions of the DGCL relating to the appraisal process received by the Company and (y) the exclusive right to direct all negotiations and proceedings with respect to demands for appraisal under the DGCL. The Company will not, except with the prior written consent of SBT, voluntarily make any payment with respect to any demands for appraisal or settle or offer to settle any such demands.

(e)    _Treatment of Options_. Prior to the date hereof, the Board of Directors of the Company (or, if appropriate, any committee thereof) has adopted appropriate resolutions and taken all other actions necessary to provide that each outstanding stock option (each an "Option") heretofore granted (i) under the Company's 1997 Stock Option Plan (the "Company Stock Plan") or (ii) to Stockholders pursuant to the agreements listed by each such Stockholder's name in Section 3.2 of the Disclosure Schedule, whether or not currently vested or exercisable, shall, at or prior to the Effective Time, be cancelled and converted into the right to receive a payment in cash only from the Surviving Corporation (subject to any applicable withholding taxes, the "Cash Payment") equal to the product of (x) the total number of shares of Company Common Stock subject or related to such Option, and (y) the excess, if any, of the Merger Price over the exercise price or purchase price, as the case may be, per share subject or related to such Option, each such Cash Payment to be paid to each holder of an outstanding Option in respect thereof. As provided herein, the Company Stock Plan and any Benefit Plan (or other plan, program or arrangement) providing for the issuance or grant of any other interest in respect of the capital stock of the Company or any Subsidiary shall terminate upon the Effective Time. The Company has taken all steps necessary to ensure that none of the Company or any of its Subsidiaries is or will be bound by any Options, other options, warrants, rights or agreements which would entitle any Person, other than the current shareholders of Acquisition or its Affiliates, to acquire any capital stock of the Surviving Corporation or any of its subsidiaries or, except as otherwise provided in this Agreement, to receive any payment in respect thereof and to cause such Options to be cancelled and converted into the right to receive the Cash Payment as defined above. The amount of any Cash Payment shall be subject to the provisions of Section 2.1(c) providing for any amounts to be deposited into escrow or paid to the Stockholders' Representative in respect of the Options and related Cash Payments and such portions of the Cash Payment held in escrow shall be paid to Option holders solely pursuant to the terms of the Escrow Agreement.

(f)    [Intentionally deleted]

(g)    _Convertible Notes_. At the Closing, each Convertible Note that is outstanding as of the Closing shall be converted solely into the right to receive that number of shares of Company Common Stock into which such Convertible Note is then convertible, and all other obligations of the Company and its Affiliates with respect to such Convertible Note shall be terminated. The Company has obtained all instruments, consents and amendments, if any, to

- 6 -

the terms of the Convertible Notes that are necessary to give effect to the provisions of this Section 2.1(g).

Section 2.2.    <u>Closing Statement Procedures</u>.

(a)    At least three business days prior to the Closing Date, the Company shall prepare and deliver to SBT (in a form and substance reasonably acceptable to SBT) and to Steven Sharpe (the "<u>Stockholders' Representative</u>") an estimated Closing Statement (the "<u>Initial Closing Statement</u>") substantially in the form of Exhibit D setting forth (x) the estimated balance sheet of the Company at the close of business on the Closing Date, which shall be prepared using the procedures set forth in the definition of Closing Date Working Capital, and (y) the Company's estimated calculation (based on the amounts set forth on the Initial Closing Statement) of the Closing Date Working Capital (which estimated amount shall be referred to as the "<u>Estimated Closing Date Working Capital</u>"). The Company will prepare the Initial Closing Statement and the estimates referred to in this Section 2.2(a) in good faith. SBT shall be entitled to review the Initial Closing Statement and the Company shall provide SBT with reasonable access to the books and records of the Company and the Subsidiaries prior to the Closing Date in connection with such review. If SBT disagrees with the preparation of the Initial Closing Statement, the Company and SBT shall attempt in good faith to resolve any disagreement with respect to the Initial Closing Statement.

(b)    As promptly as practicable, but in any event not later than 30 days after the Closing Date, SBT shall cause to be prepared and delivered to the Stockholders' Representative a draft Closing Statement (the "<u>Closing Statement</u>") substantially in the form of Exhibit D setting forth (x) the balance sheet of the Company at the close of business on the Closing Date, which shall be prepared using the procedures set forth in the definition of Closing Date Working Capital, and (y) SBT's calculation (based on the amounts set forth on the balance sheet) of the Closing Date Working Capital.

(c)    Subject to the provisions of paragraph (d) below, the Stockholders' Representative shall have 15 business days from the date of delivery of the Closing Statement to review the Closing Statement. The Surviving Corporation shall provide the Stockholders' Representative with reasonable access to the books and records of the Company and the Subsidiaries during the 15 business days following the delivery of the Closing Statement to the Stockholders' Representative. If the Stockholders' Representative agrees with SBT's calculation of the Closing Date Working Capital contained in the Closing Statement, the Stockholders' Representative shall promptly so advise SBT in writing, in which event the Closing Date Working Capital shall be deemed final.

(d)    If the Stockholders' Representative in good faith disagrees with the calculation of the Closing Date Working Capital set forth in the Closing Statement, the Stockholders' Representative shall notify SBT in writing (the "<u>Notice of Disagreement</u>") of such disagreement within 15 business days after delivery of the Closing Statement. The Notice of Disagreement shall set forth in reasonable detail the basis for the disagreement. Thereafter, SBT and the Stockholders' Representative shall attempt in good faith to resolve and finally determine

- 7 -

the Closing Statement and the calculation of the Closing Date Working Capital. If SBT and the Stockholders' Representative are unable to resolve the disagreement within 10 days after the delivery of the Notice of Disagreement, SBT and the Stockholders' Representative shall appoint Arthur Andersen LLP (the "Independent Accountant") to resolve the disputed items and make a determination with respect thereto. Such determination will be made, and written notice thereof given to SBT and the Stockholders' Representative, within 30 days after such selection. The determination by the Independent Accountant shall be final, binding and conclusive upon the parties hereto. The scope of the Independent Accountant's engagement (which shall not be an audit) shall be limited to the resolution of the items contained in the Notice of Disagreement, and the recalculation, if any, of the Closing Date Working Capital in light of such resolution, and such firm shall be deemed to be acting as experts and not as arbitrators. In its review of the Closing Statement and recalculation of the Closing Date Working Capital, the Independent Accountant will be limited to using the procedures set forth in the definition of Closing Date Working Capital. The fees, costs and expenses of the Independent Accountant, if any, will be allocated between SBT and the Stockholders' Representative (in his representative capacity) (it being understood that the Stockholders' Representative's portion thereof shall be one of the expenses for which he is entitled to receive reimbursement in accordance with the terms of Section 2.1(c)(iii)) such that the Stockholders' Representative's share of such fees, costs and expenses will be the same proportion that (x) the aggregate amount of the disputed items submitted by the Stockholders' Representative to the Independent Accountant that are unsuccessfully disputed bears to (y) the total amount of all disputed items submitted by the Stockholders' Representative to the Independent Accountant.

(e)    Within two business days of the final determination of the Closing Date Working Capital, the Stockholders' Representative shall pay to SBT, by wire transfer of immediately available funds, the Post-Closing Adjustment Amount, if the Post-Closing Adjustment Amount is negative, and SBT will pay to the Stockholders' Representative, by wire transfer of immediately available funds, the Post-Closing Adjustment Amount, if the Post-Closing Adjustment Amount is positive (it being understood that SBT shall not be required to pay any amounts in excess of the Initial Working Capital Adjustment). Within two business days of the final determination of the Closing Date Working Capital, SBT and the Stockholders' Representative shall each notify the other of any amounts or claims of which either such party is aware that should have been, but were not, included in the calculation of the Closing Debt Amount or amounts to be paid by the Stockholders' Representative out of the Stockholders' Representative Expense Amount. The "Post-Closing Adjustment Amount" shall mean (x) the lesser of the Working Capital Amount and Closing Date Working Capital, as finally determined, minus (y) the lesser of the Working Capital Amount and the Estimated Closing Date Working Capital, minus (z) any amounts that should have been, but were not, included in the calculation of the Closing Debt Amount or paid by the Stockholders' Representative out of the Stockholders' Representative Expense Amount.

Section 2.3.    Payment of Funds at and following the Closing.

(a)    On the Closing Date, (i) SBT shall deposit with the Escrow Agent funds in an amount equal to the aggregate Initial Payments; (ii) SBT shall deposit with the Escrow Agent funds in an amount equal to the Escrow Amount; and (iii) SBT shall deposit with the Stockholders' Representative, the Stockholders' Representative Expense Amount.

Section 2.4.    Payment for Certificates and Options.

(a)    Escrow Funds.  The Escrow Agent shall be appointed no later than the Closing Date.  The Escrow Agent shall agree to hold the funds deposited with it in its capacity as the Escrow Agent pursuant to the Escrow Agreement for disbursement as provided in this Section 2.4.

(b)    Payment Procedures.  As soon as reasonably practicable after the date hereof, the Company shall cause to be mailed a Letter of Transmittal to each Stockholder, and as soon as reasonably practicable after the Effective Time, the Surviving Corporation shall cause a Letter of Transmittal to be mailed to each Employee Optionholder.  Upon surrender of a Certificate (including those issued in respect of the Convertible Notes) or Option Agreement (or an affidavit of lost Certificate or lost Option Agreement in a form reasonably acceptable SBT and to the Escrow Agent) to the Escrow Agent, together with such Letter of Transmittal, duly executed and completed in accordance with its terms, the holder of such Certificate or Option Agreement shall be entitled to receive in exchange therefor a check representing the Initial Payment and the right to receive the balance, if any, of the Merger Price per share or the Cash Payment per Option represented by such Certificate or Option Agreement, and the Certificate or Option Agreement so surrendered shall forthwith be cancelled.  The "Initial Payment" shall mean, in the case of a Certificate, as to each Share represented thereby, (x) the Adjusted Acquisition Price (assuming, for purposes of this calculation only, that the Stockholders and the Employee Optionholders shall not be entitled to receive any portion of the Escrow Amount or the Stockholders' Representative Expense Amount) divided by (y) the Fully Diluted Share Amount.  The Initial Payment shall mean, in the case of an Option Agreement, as to each share of Company Common Stock into which such Option Agreement was immediately prior thereto exercisable, an amount equal to the dollar amount per share of the Initial Payment in respect of Certificates minus the exercise price per share of such Option Agreement.  Schedule 2.1(c)(i) sets forth, for illustrative purposes, a hypothetical calculation of the Initial Payment per Share and per Option.  If any Merger Price is to be remitted to a Person whose name is other than that in which the Certificate or Option Agreement for Shares surrendered for exchange is registered, it shall be a condition of such exchange that the Certificate or Option Agreement so surrendered shall be properly endorsed, or otherwise in proper form for transfer, and that the Person requesting such exchange shall have paid any transfer and/or other taxes required by reason of the remittance of Merger Price to a Person whose name is other than that of the registered holder of the Certificate or Option Agreement surrendered, or the Person requesting such exchange shall have established to the satisfaction of the Surviving Corporation that such tax either has been paid or is not applicable.  Except as otherwise provided in the Escrow Agreement, in no event shall the holder of any Certificate or Option Agreement be entitled to receive interest on any funds to be received in the Merger.  Until surrendered as contemplated by this Section 2.4(b),

- 9 -

each Certificate shall be deemed at all times after the Effective Time to represent only the right to receive the Merger Price and each Option Agreement shall be deemed at all times after the Effective Time to represent only the right to receive the Cash Payment.

(c)    Remaining Escrow Balance.  As soon as reasonably practicable following the end of the Escrow Period, the Escrow Agent shall distribute a portion of the Remaining Escrow Balance to each Person entitled thereto pursuant to Section 2.1(c) upon compliance by each such Person with such instructions as the Escrow Agent may reasonably require.  Except as expressly provided in the Escrow Agreement, in no event shall interest be paid on any such amount.

(d)    Remaining Stockholders' Representative Expense Amount.  (i) It is acknowledged and agreed by the Parties that TWO MILLION DOLLARS ($2,000,000) of the Stockholders' Representative Expense Amount has been deposited with the Stockholders' Representative in a bank account in the United States reasonably satisfactory to SBT, with authorization by SBT and the Stockholders' Representative, which will not be unreasonably withheld, required on all disbursements to pay the first TWO MILLION DOLLARS ($2,000,000) of the Post-Closing Adjustment Amount.  Promptly following the determination of the Post-Closing Adjustment Amount, and after the payment of the Post-Closing Adjustment Amount to SBT, if required to be paid by SBT pursuant to Section 2.2(e) (or, if applicable, upon receipt of the Post-Closing Adjustment Amount from SBT, if required pursuant to Section 2.2(e)), the Stockholders' Representative shall distribute the amount, if any, by which TWO MILLION DOLLARS ($2,000,000) exceeds the Post-Closing Adjustment Amount, or, in the event a Post-Closing Adjustment Amount is required to be paid to SBT pursuant to Section 2.2(e), an amount equal to TWO MILLION DOLLARS ($2,000,000) plus the Post-Closing Adjustment Amount so paid by SBT, to the Escrow Agent for distribution to the Stockholders and Employee Optionholders.

(ii)    It is acknowledged and agreed by the Parties that THREE MILLION DOLLARS ($3,000,000) of the Stockholders' Representative Expense Amount has been deposited with the Stockholders' Representative in a bank account in the United States (which shall not be the same bank account as that referred to in Section 2.4(d)(i)) to pay such amounts as may be determined by the Stockholders' Representative to be paid to employees of the Company in respect of the employee incentive bonus plan.  Any amounts not paid to employees under such plan shall, within 60 days after the Effective Time, be distributed by the Stockholders' Representative to the Escrow Agent for distribution to the Stockholders and the Employee Optionholders.  The Parties acknowledge and agree that SBT, Acquisition, the Company and the Surviving Corporation shall have no liability whatsoever to any Person in respect of such plan. The Stockholders each acknowledge and agree that any payments under such plan shall be at the sole discretion of the Stockholders' Representative.

(e)    No Further Ownership Rights in Company Common Stock.  From and after the Effective Time, the stock transfer books of the Company shall be closed and there shall be no further registration of transfers on the stock transfer books of the Surviving

Corporation of the shares of Company Common Stock which were outstanding immediately prior to the Effective Time. If, after the Effective Time, Certificates are presented to the Surviving Corporation for any reason, they shall be cancelled and exchanged as provided in this Section 2.4.

(f)    Escheat.  Neither SBT nor the Surviving Corporation shall be liable to any holder of shares of capital stock of the Company for cash representing the merger consideration delivered to a public official pursuant to any applicable abandoned property, escheat or similar law.

Section 2.5.    Payment of Certain Debt to Stockholders.  At Closing, SBT shall pay or cause to be paid by wire transfer of immediately available funds (to an account or accounts designated in writing to SBT by the Stockholders' Representative at least two business days prior to Closing) all amounts that are included in the Closing Debt Amount and which are owed to Stockholders; provided that such Stockholders shall have executed releases in substantially the form of Exhibit E in favor of SBT and the Surviving Corporation.

ARTICLE III  REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to Acquisition and to SBT that the statements contained in this Article III are correct and complete, as supplemented as set forth in the disclosure schedule delivered by the Company to SBT on the date hereof and initialed by the Parties (the "Disclosure Schedule").  The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered Sections contained in this Article III, and the disclosures in any Section, including appropriate cross references, shall qualify only the corresponding Section in this Article III.  Subject to the foregoing, the Company represents and warrants to Acquisition and SBT as follows:

Section 3.1.    Organization.  (a) The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to carry on its business as it has been and is now being conducted and to own, use and lease its assets and properties.  The Company is duly qualified or licensed as a foreign corporation to do business and is in good standing in each jurisdiction where the nature of its business or the ownership, leasing or operation of its assets and properties makes such qualification or licensing necessary, except where the failure to be so qualified or licensed and in good standing could not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Except for the Subsidiaries of the Company set forth in Section 3.5 of the Disclosure Schedule, the Company does not and has not, directly or indirectly, own or owned any equity or similar interest in or have any other ownership right in any other Person, nor does it have any obligation to purchase any shares of stock, other securities or other form of investment in any other Person.

Section 3.2.    Capitalization.  (a) The total authorized shares of capital stock of the Company consists solely of (i) 3,000,000 shares of Company Common Stock, of which

1,021,348 shares are issued and outstanding. No shares of Company Common Stock are held in treasury. No shares of Company Common Stock were issued after the date of this Agreement, other than pursuant to the exercise of Options outstanding as of the date of this Agreement. 500,000 Shares of Company Common Stock are available for issuance upon the exercise of Options under the Company Stock Plan, 259,750 shares of which were subject to outstanding Options. 24,913 Shares of Company Common Stock are issuable upon the exercise of the Options not issued under the Company Stock Plan and listed in Section 3.2(b) of the Disclosure Schedule. 42,499 Shares of Company Common Stock are issuable upon the conversion of the Convertible Notes. At the Effective Time, the Convertible Notes then outstanding, if any, will be converted into the number of shares of Company Common Stock each such Convertible Note is convertible for, in accordance with Section 3.2(b) of the Disclosure Schedule and Sections 2.1(f) and 2.1(g). All the outstanding shares of Company Common Stock have been duly and validly authorized and issued and are fully paid and nonassessable. No shares of capital stock have been issued by the Company at any time in violation of the preemptive rights of any stockholder of the Company. All shares of capital stock of the Company and all securities convertible or exercisable into shares of capital stock of the Company, including the Options and the Convertible Notes, currently outstanding or previously issued by the Company were offered, issued and sold in compliance with all applicable Federal and state securities laws and regulations.

(b)      Section 3.2(b) of the Disclosure Schedule sets forth a complete and accurate listing of all options, warrants, restricted stock grants and other rights to acquire shares of Company Common Stock outstanding. Other than as set forth on Section 3.2(b) of the Disclosure Schedule, there are no existing agreements, subscriptions, options, warrants, calls, commitments, trusts (voting or otherwise), or rights of any kind whatsoever between the Company and any Person, granting any interest in or the right to purchase or otherwise acquire from the Company or granting to the Company any interest in or the right to purchase or otherwise acquire from any Person, at any time, or upon the occurrence of any stated event, any securities of the Company, whether or not presently issued or outstanding. There are no other outstanding securities of the Company or any other entity which are convertible into or exchangeable for other securities of the Company. There are no proxies, agreements or understandings with respect to the voting of the shares of Company Common Stock to which the Company is a party or, to the Knowledge of the Company, to which any other Person is a party or any agreements, subscriptions, options, warrants, calls, commitments or rights of any kind granting to any Person the right to purchase or otherwise acquire from the Company any securities so convertible or exchangeable. Section 3.2(b) of the Disclosure Schedule sets forth the exercise or strike price of each outstanding Option and the number of Shares into which each Convertible Note is convertible.

(c)      Each of the Stockholders is the record and beneficial owner of the number of Shares of Company Common Stock, Convertible Notes and Options (including the Company Common Stock issuable upon the conversion or exercise thereof) set forth on Section 3.2(a) and Section 3.2(b) of the Disclosure Schedule (the "Existing Securities"), and each Stockholder owns such Existing Securities free and clear of all Liens. None of the Stockholders

owns any Company securities on the date of this Agreement other than the Existing Securities, and except as set forth in Section 3.2 of the Disclosure Schedule, no other Person owns any Company securities. Each of the Stockholders has sole voting power and sole power to issue instructions with respect to the voting of his, her or its respective Existing Securities, sole power of disposition, sole power of exercise or conversion and the sole power to demand appraisal rights, in each case with respect to all of his, her or its respective Existing Securities. On the effective date of the written consent in lieu of a meeting obtained in accordance with the provisions of the DGCL, pursuant to which the Merger and this Agreement have been approved, each of the Stockholders had sole voting power and sole power to issue instructions with respect to the voting of all of his, her or its respective Existing Securities, sole power of disposition, sole power of exercise or conversion and the sole power to demand appraisal rights, in each case with respect to all of his, her or its respective Existing Securities. The Existing Securities are now and, at all times during the term hereof, will be held by each of the Stockholders, or by a nominee or custodian for the benefit of such Stockholders, free and clear of all Liens.

(d)    The Company has not:

(i)    since March 31, 2001, declared, set aside, made or paid any dividend or other distribution, payable in cash, stock, property or otherwise with respect to any of its capital stock;

(ii)    since March 31, 2001, reclassified, combined, split, subdivided or redeemed, purchased or otherwise acquired, directly or indirectly, any of its capital stock;

(iii)    since March 31, 2001, incurred any indebtedness for borrowed money or issued any debt securities or assumed, guaranteed or endorsed, or otherwise as an accommodation become responsible for, the obligations of any Person (absolute, accrued, contingent or otherwise), or made any loans or advances except pursuant to existing lines of credit or other existing credit facilities in the ordinary course of business; or

(iv)    except as set forth in Section 3.2(d) of the Disclosure Schedule, since March 31, 2001, entered into or amended any contract, agreement, commitment or arrangement with respect to any matter set forth in this Section 3.2(d).

(e)    All amounts of outstanding indebtedness owed by the Company are repayable at any time without requiring the payment of any premium on the part of the Company or resulting in any penalty to the Company.

Section 3.3.    Authority.  (a) The Company has full corporate power and authority to enter into this Agreement and the Escrow Agreement and has obtained by written consent the approval by its stockholders of the adoption of this Agreement and the Escrow Agreement ("Stockholder Approval"), to the extent required by the DGCL, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Escrow Agreement by the

Company and the consummation by the Company of the transactions contemplated hereby and thereby have been duly authorized and approved by the Company's Board of Directors, and except for the filing of the Certificate of Merger pursuant to the DGCL, no other corporate proceedings on the part of the Company or its stockholders are necessary to authorize the execution, delivery and performance of this Agreement and the Escrow Agreement or the consummation of the transactions contemplated hereby and thereby. This Agreement has been, and as of the Closing Date the Escrow Agreement will be, duly authorized, executed and delivered by the Company. This Agreement is, and as of the Closing Date the Escrow Agreement will be, the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by the effect of general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

(b)     Each of the Stockholders has the full power and authority to enter into and perform all of such Stockholder's obligations under this Agreement and the Escrow Agreement. If the Stockholder is an individual, such Stockholder has the legal capacity to execute and deliver this Agreement and any Collateral Document required to be executed and delivered by such Stockholder hereunder, the Escrow Agreement, and to consummate the transactions contemplated hereby and thereby. If a Stockholder is an entity, the execution, delivery and performance by such Stockholder of this Agreement and any Collateral Document required to be executed and delivered by such Stockholder hereunder, and of the transactions contemplated hereby and thereby and the performance of its obligations under this Agreement and such Collateral Documents, have been duly authorized by all necessary corporate, partnership or trust action on the part of such Stockholder, and no other action on the part of such Stockholder is required to authorize the execution, delivery and performance of this Agreement or any Collateral Document required to be executed and delivered by such Stockholder hereunder, or the consummation by such Stockholder of any of the transactions contemplated hereby and thereby. Each Stockholder has executed a written consent in accordance with Section 228 of the DGCL as a holder of Company Common Stock with respect to all Shares held of record by such Stockholder approving this Agreement and the Merger in accordance with Section 251 of the DGCL. This Agreement is, and as of the Closing Date, Collateral Documents (to the extent each such Stockholder is a party thereto or bound thereby) will be, the legal, valid and binding obligation of each of the Stockholders, enforceable against each Stockholder hereto in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by the effect of general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law). Each Stockholder that is a holder of Convertible Notes has executed and delivered all instruments, consents and amendments that may be required to give effect to Section 2.1(g) and hereby agrees not to take any action that would cause such instruments, consents or amendments not to be in full force and effect at the Effective Time. Each Stockholder acknowledges that such Stockholder has been advised to seek representation by counsel in connection with the execution and delivery of this Agreement and

- 14 -

the Collateral Documents (to the extent executed by such Stockholder) and the transactions contemplated hereby and thereby.

Section 3.4.    <u>No Conflicts; Governmental Requirements</u>.  (a) The execution, delivery and performance by the Company of this Agreement, the Collateral Documents required to be executed and delivered by each Stockholder hereunder, and the consummation of the Merger do not, and will not, (i) violate or conflict with any provision of the certificate of incorporation or by-laws of the Company or, if applicable, any organizational documents of any Stockholder (including without limitation any charter documents or trust instruments), (ii) violate any law, rule, regulation, ordinance or applicable constitution or order, writ, injunction, judgment, award, restriction, ruling or decree of any court, arbitrator or federal, state, local or foreign governmental or regulatory entity (or any department, agency, authority or political subdivision thereof), or (iii) except as set forth in Section 3.4(a) of the Disclosure Schedule or on footnote 1 of Section 3.2 of the Disclosure Schedule (other than in respect of consents to the leases referred to on Schedule 6.1(m)), result in a violation or breach of, conflict with, or constitute a default (or an event which might, with the passage of time or the giving of notice, or both, constitute a default) under, or result in or give rise to any right of termination, modification, cancellation or acceleration, or require any consent, approval or notice under, any note, bond, indenture, license, lien, franchise, mortgage, loan or credit agreement, contract, agreement, lease, permit, guaranty or other agreement, instrument or obligation to which such Stockholder is a party or by which any of its assets or properties may be bound or affected, or, in the case of the Company and its Subsidiaries, which is listed in Section 3.10 or Section 3.12 of the Disclosure Schedule (written or oral) and to which the Company or any Subsidiary of the Company is a party or by which any of their assets or properties may be bound or affected.

(b)    Except for (i) the filing of a premerger notification report by the Company under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder (the "<u>HSR Act</u>"), (ii) the filing of the Certificate of Merger pursuant to the DGCL and (iii) any other consents, approvals, authorizations, permissions, notices or filings which if not obtained or made could not, individually or in the aggregate, have a Material Adverse Effect or materially delay or render unlawful the consummation of the Merger or the other transactions contemplated by this Agreement and the Escrow Agreement, the execution and delivery of this Agreement and the Escrow Agreement by the Company and the Stockholders do not, and the performance by the Company and the Stockholders of this Agreement and the Escrow Agreement will not, require any consent, approval, authorization or permission of, or filing with or notification to, any governmental or regulatory authority, domestic or foreign.

(c)    The Company has furnished to SBT and Acquisition copies of all notices, documents, requests, court papers, or similar materials given to or received from any governmental agency or any other third party with respect to the transactions contemplated by this Agreement.

Section 3.5.    <u>Subsidiaries</u>.  Section 3.5 of the Disclosure Schedule lists the name of each Subsidiary and all lines of business in which each Subsidiary is participating or engaged. Each Subsidiary is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation identified in Section 3.5 of the Disclosure Schedule, and has all requisite power and authority to carry on its business as it has been and is now being conducted and to own, use and lease its assets and properties.  Each Subsidiary is duly qualified or licensed as a foreign corporation to do business and is in good standing in each jurisdiction specified in Section 3.5 of the Disclosure Schedule, which are the only jurisdictions in which nature of its business or the ownership, leasing or operation of such Subsidiary's assets and properties makes such qualification or licensing necessary, except where the failure to be so qualified or licensed and in good standing, could not, individually or in the aggregate, have a Material Adverse Effect.  Section 3.5 of the Disclosure Schedule lists for each Subsidiary the amount of its authorized capital stock, the amount of its outstanding capital stock and the record owners of such outstanding capital stock.  All of the outstanding shares of capital stock of each Subsidiary have been duly authorized and validly issued, are fully paid and nonassessable, and are owned, beneficially and of record, by the Company or Subsidiaries wholly owned by the Company free and clear of all Liens.  There are no existing agreements, subscriptions, options, warrants, calls, commitments, trusts (voting or otherwise), or rights of any kind whatsoever between the Company or any Subsidiary on the one hand and any Person on the other hand with respect to the capital stock of any Subsidiary.  The name of each director and officer of each Subsidiary on the date hereof, and the position with such Subsidiary held by each, are listed in Section 3.5 of the Disclosure Schedule.  Other than the Subsidiaries, the Company does not, directly or indirectly, own any stock of or any other equity interest in any other corporation or business entity.

Section 3.6.    <u>Books and Records</u>.  The minute books and other similar records of the Company and the Subsidiaries as made available to SBT and its representatives prior to the execution of this Agreement contain a true and complete record, in all material respects, of all actions taken at all meetings and by all written consents in lieu of meetings of the stockholders, the boards of directors and all committees of the boards of directors of the Company and the Subsidiaries.  The stock transfer ledgers and other similar records of the Company and the Subsidiaries as made available to SBT prior to the execution of this Agreement contain true and complete records, in all material respects, of all stock transfers related to the Company's or any Subsidiary's capital stock.  The Company has previously furnished to SBT true, complete and correct copies of the certificate of incorporation and the by-laws of the Company and each Subsidiary as in effect on the date hereof.

Section 3.7.    <u>Financial Statements</u>.  The consolidated financial statements of the Company for the years ended June 30, 1998, 1999 and 2000 (the "<u>Audited Financial Statements</u>") and for the nine months ended March 31, 2001 (the "<u>Interim Financial Statements</u>" and, together with the Audited Financial Statements, the "<u>Financial Statements</u>") included in Section 3.7 of the Disclosure Schedule are correct and complete and in accordance with the books and records of the Company and the Subsidiaries, were prepared in accordance with U.S. generally accepted accounting principles ("<u>GAAP</u>") applied on a consistent basis, except as may

- 16 -

be stated therein, during the periods involved and fairly present the consolidated financial position of the Company and the Subsidiaries taken as a whole, as of the dates thereof and the consolidated results of operations and cash flows for the periods then ended (subject, in the case of Interim Financial Statements, to normal year-end adjustments and the absence of footnotes). The Periodic Financial Statements delivered pursuant to Section 5.13: (a) are correct and complete and in accordance with the books and records of the Company and the Subsidiaries, (b) fairly present the consolidated financial condition of the Company and the Subsidiaries taken as a whole as at such calendar month and the consolidated results of operations and cash flows for the calendar month and year-to-date period then ended, and (c) have been prepared in accordance with GAAP applied on a consistent basis during the period involved, except for normal recurring year-end adjustments and the absence of footnotes.

Section 3.8.    Absence of Undisclosed Liabilities.  Except as disclosed in Section 3.8 of the Disclosure Schedule and except as reflected on the balance sheet included in the Interim Financial Statements, or to the extent included in the Closing Debt Amount, the Closing Date Working Capital or included in (and actually paid out of) the Stockholders' Representative Expense Amount, neither the Company nor any of its Subsidiaries has or has incurred any liability or obligation of any nature (whether direct or indirect, matured or unmatured, or absolute, accrued, contingent or otherwise) except for liabilities or obligations (other than obligations for borrowed money or in respect of capitalized leases) incurred after March 31, 2001 in the ordinary course of business and fully reflected on the Closing Statement, none of which ordinary course liabilities could reasonably be expected to have a Material Adverse Effect. The Parties agree that, to the extent included in the Closing Debt Amount, ordinary course borrowings under the Company's revolving credit facility under the Company Credit Facility and the maturation of the Company's obligation to pay when due the lease payments under the capital leases referenced on Schedule 1 shall not be deemed to be breaches of this Section 3.8.

Section 3.9.    Operations and Obligations.  Except as disclosed in Section 3.9 of the Disclosure Schedule since March 31, 2001:

(a)    there has been no casualty, destruction, conversion, theft, physical damage or business interruption, not covered by insurance, or condemnation or other taking materially affecting in any respect any of the Company's or any Subsidiary's assets;

(b)    neither the Company nor any Subsidiary has made any wage or salary increase or otherwise increased the compensation payable or to become payable, or approved or effectuated any bonus or increase in any other direct or indirect compensation, or made any loans or advances for or to any of their officers, directors, employees, independent contractors, consultants, agents or other representatives, or any accrual for or commitment or agreement to make or pay the same, other than the increases made in the ordinary course of business consistent with past practice;

(c)    there has not been any payment, distribution, sale, transfer or lease of properties or assets (real, personal, mixed, tangible or intangible) to, or the entering into any arrangement with any officer, director, employee, independent contractor, consultant, agent or

- 17 -

other representative of the Company, its Subsidiaries or any other Affiliates of the Company or its Subsidiaries or any "associates" (as such term is defined in the rules and regulations of the Securities and Exchange Commission) of any of the foregoing;

(d)    there has not been any change or, to the Knowledge of the Company, any threat of any change in any of the Company's or its Subsidiaries' relations with, or any loss or, to the Knowledge of the Company, threat of loss of any of their suppliers, clients or customers which, individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect, or any alteration in any material respect of the customary practices with respect to the collection of accounts receivable of the Company or its Subsidiaries or payment of accounts payable of the Company or its Subsidiaries or the provision of discounts, rebates or allowances;

(e)    neither the Company nor any of its Subsidiaries has discharged or satisfied any Liens, or paid or satisfied any of their respective obligations or liabilities, (whether absolute, accrued, contingent or otherwise) other than (i) liabilities shown or reflected on the Interim Balance Sheet, (ii) liabilities incurred in the ordinary course of business consistent with past practice and which have not had and could not have a Material Adverse Effect, or (iii) liabilities expressly permitted by this Agreement to be discharged;

(f)    the Company has not failed to pay or perform, or delayed its payment or performance of, any obligation in a manner materially inconsistent with its past practice;

(g)    neither the Company nor any Subsidiary has disposed of or failed to keep in effect any rights in, to or for the use of any material permit or Authorization or any other contracts which, individually or in the aggregate, are material to the Company and the Subsidiaries;

(h)    there has not been any modification, amendment or termination of any of the contracts or other agreements disclosed in Section 3.12 of the Disclosure Schedule, which modifications, amendments or terminations in the aggregate are materially adverse to the Company and the Subsidiaries; provided, however, that the aggregate effect of any such modifications, amendments or terminations of customer contracts required to be disclosed by Section 3.12(a) shall be construed to include the effect of all new customer contracts since March 31, 2001, that would be required to be disclosed in Section 3.12(a) of the Disclosure Schedule;

(i)    there has not been any cancellation, modification or waiver of any material debts or claims held by the Company or its Subsidiaries (including any such debts or claims of an Affiliate of the Company or its Subsidiaries) or any waiver of any other rights of the Company or its Subsidiaries;

(j)    there has not been any change by the Company (including its Subsidiaries) of its method of accounting or keeping its books of account or accounting practice,

including any change in any assumptions underlying or methods of calculating, any bad debt, contingency, tax or other reserves or any changes in estimates or valuations;

(k)     there has not been any disposition of or failure to keep in effect any rights in, to or for the use of any Intellectual Property which is or has been used in the ordinary course of business consistent with past practice;

(l)     neither the Company nor any Subsidiary has sold, transferred or otherwise disposed of any assets, properties or rights, except in the ordinary course of business consistent with past practice;

(m)     neither the Company nor any Subsidiary is subject or party to any binding commitments or agreements for capital expenditures or commitments for additions to plant, property or equipment constituting capital assets in excess of $50,000 with respect to each such capital expenditure or commitment and not more than $1,000,000 in the aggregate;

(n)     neither the Company nor any Subsidiary has mortgaged, pledged or subjected to Lien any of its properties or assets, tangible or intangible; and

(o)     neither the Company nor any of its Subsidiaries have committed to any of the foregoing.

Section 3.10.  Properties.  (a) Section 3.10(a) of the Disclosure Schedule contains a true, complete and correct list (designating the relevant owners, lessors and lessees) of all equipment, fixtures and other personal property owned, leased, subleased or managed by the Company or any Subsidiary which has a net book value or commitment in excess of $50,000. Copies of all personal property leases and material documentation of the Company and each Subsidiary relating to the property identified on Section 3.10(a) of the Disclosure Schedule have been delivered or made available to SBT by the Company.

(b)     Except as set forth in Section 3.10(b) of the Disclosure Schedule, the Company or a Subsidiary owns outright or has good and marketable fee title to or a valid leasehold or license interest in all of its respective personal assets and properties (including, without limitation, those reflected as assets on the balance sheet included in the Interim Financial Statements and the Closing Statement), in each case free and clear of any Lien. The Company, together with its Subsidiaries, has all necessary personal assets, equipment and properties to engage in the business as currently conducted and proposed to be conducted by the Company.

(c)     Neither the Company nor any of its Subsidiaries holds or has held fee simple title to any real property, and all of the estate, right, title and interest of the Company and the Subsidiaries in any real property is held under the Leases.

(d)     Section 3.10(d) of the Disclosure Schedule sets forth a list of all of the oral or written leases, subleases or rights of occupancy pursuant to which the Company or any Subsidiary leases or subleases any real property or interest therein (collectively, as

- 19 -

heretofore modified, amended or extended, the "Leases"), including the identification of each of the lessors thereof and the street addresses of all of the real estate demised under each of the Leases (collectively, the "Leased Real Property"). True and correct copies of (i) any leasehold title insurance policies and commitments, surveys, licenses, certificates of occupancy, plans, specifications, and permits pertaining to the Leased Real Property that are in the possession or control of the Company or any Subsidiary, other than certificates of occupancy, immaterial permits or immaterial licenses located on the premises of the Leased Real Property, and (ii) each of the Leases, including all amendments, modifications and extensions thereof, and all subordination, non-disturbance and/or attornment agreements related thereto, have been made available by the Company and the Subsidiaries to Acquisition and SBT. Each of the Leases is valid, binding, in full force and effect and enforceable in accordance with its terms. Neither the Company nor any Subsidiary has received any written notice of default under any Lease which has not been cured, withdrawn or otherwise resolved. Neither the Company nor any Subsidiary, nor to the knowledge of the Stockholders and the Company, any other party to any Lease, is in material default under any Lease and no event has occurred that with the giving of notice, the passage of time or both would constitute such a default.

(e)    The Company and the Subsidiaries are in actual, exclusive possession of the Leased Real Property and have good, valid and indefeasible title to all the leasehold estates created under the Leases free and clear of all Liens.

(f)    All rent, including without limitation, all additional rent and all other charges and amounts payable under the Leases by the lessee thereunder have been paid to date. All work required to be performed under the Leases by the lessors or lessees thereunder has been performed in all material respects, and, to the extent that the Company or any Subsidiary was responsible for payment of such work, has been fully paid for, except as set forth in Section 3.10(f) of the Disclosure Schedule.

(g)    Except as set forth on Section 3.10(g) of the Disclosure Schedule, there are no brokerage commissions or finder's fees due from the Company or any Subsidiary (whether now or hereafter due) which are unpaid with regard to any of the Leases or the Leased Real Property.

(h)    The water, gas, electricity, telephone and data transmission lines and other utilities serving the Leased Real Property have been and are currently adequate in all material respects to service the normal operations conducted thereon consistent with past practice.

(i)    Each of the Leased Real Properties has physical and, to the Company's knowledge, legal vehicular and pedestrian access to and from public roadways, and the Company has no knowledge of any plan or threat to terminate any such access.

(j)    Except as set forth on Section 3.10(j) of the Disclosure Schedule, neither the Company nor any Subsidiary has received any written or, to the Company's knowledge, oral notice or order from any Governmental Entity, insurance company which has

- 20 -

issued a policy with respect to any of the Leased Real Property or any board of fire underwriters or other body performing similar functions or any other Person which (a) relates to or alleges a violation of or nonconformity with any zoning, building, safety, subdivision, wetlands or other similar law, code, rule, regulation, ordinance, permit, license, certificate, covenant, restriction or condition with respect to any of the Leased Real Property or the use thereof, or (b) requests the performance of any material repairs, alterations or other work that have not yet been cured or performed, as applicable. Neither the Company nor any Subsidiary has received any written notice from any Governmental Entity or other Person of any condemnation action, eminent domain proceeding or other similar proceeding concerning any of the Leased Real Property and no such action or proceeding is pending or, to the Knowledge of the Company has been threatened.

(k)     All of the buildings and improvements situated upon the Leased Real Property are operable and in good operating condition and repair, subject to ordinary wear and tear.

(l)     Other than the Leased Real Property, no real estate is necessary for the conduct of, or is material to, the business of the Company and the Subsidiaries as currently conducted.

Section 3.11.  <u>Accounts Receivable; Accounts Payable; Inventory</u>.  (a)  All accounts receivable of the Company and the Subsidiaries included in the Closing Statement (i) are valid and collectible obligations (net of any reserve for doubtful accounts reflected in the Closing Statement) of the respective makers thereof; (ii) were not and are not subject to any material offset or counterclaim; and (iii) have arisen from bona fide transactions by the Company and the Subsidiaries in the ordinary course of their business consistent with past practice.  The Company's and Subsidiaries' accounts receivable are reflected on the balance sheet included in the Interim Financial Statements and the Closing Statement in accordance with GAAP applied on a basis consistent with past practice.  Since the date of the Interim Financial Statements, there have not been any material write-offs as uncollectible of any of the Company's or the Subsidiaries' accounts receivable, except for write-offs in the ordinary course of business and consistent with past practice.

(b)     Section 3.11(b) of the Disclosure Schedule sets forth a true and correct list of each account payable of the Company and each Subsidiary, in each case in excess of $20,000 (and the age of such payable), as of the second business day immediately preceding the date of this Agreement.

(c)     The inventories (and any reserves with respect thereto that have been established by the Company or a Subsidiary) of the Company and the Subsidiaries as of the date of the latest balance sheet included in the Interim Financial Statements are described in Section 3.11(c) of the Disclosure Schedule.  All such inventories (net of any such reserves) are (i) of such quality as to be useable in the ordinary course of business (subject in the case of work-in-process inventory to completion in the ordinary course of business), and (ii) are reflected in the latest balance sheet included in the Interim Financial Statements and in the books

- 21 -

and records of the Company at the lower of cost or market using the first-in-first-out method. The inventories of the Company and the Subsidiaries are consistent in all material respects (both as to amount and type) with the requirements of the Company and the Subsidiaries in the ordinary course of business.

Section 3.12.  Contracts.  (a) Except as set forth in Section 3.12 of the Disclosure Schedule, neither the Company nor any Subsidiary is a party to or is bound or affected by:

(i)  any contract or commitment (or group of related contracts or commitments payable to any one Person and its Affiliates) which creates an obligation on the part of or involves the payment or could reasonably involve the potential payment by or to the Company or any Subsidiary in excess of $250,000, other than real property leases with annual aggregate rental payments of less than $250,000;

(ii)  any contract or commitment (or group of related contracts or commitments) which obligates the Company or any Subsidiary to deliver any hardware, software, technology or services or rights related thereto and which has generated, within the twelve months preceding the date of this Agreement, or is forecasted to generate, within the twelve month period after the date of this Agreement, revenue in excess of $250,000;

(iii)  any contract or commitment (or group of related contracts or commitments) that has resulted in, or to the Company's knowledge as of the date hereof is reasonably expected to result in, a loss to the Company in excess of $50,000 individually, or $100,000 when aggregated in with all other such contracts or commitments with any one Person of its Affiliates resulting in a loss to the Company;

(iv)  any waiver or release of the Company's or any Subsidiary's rights against a third party (other than immaterial rights) since March 31, 2001;

(v)  any debt instrument, including, without limitation, any loan agreement, line of credit, promissory note, security agreement or other evidence of indebtedness, where the Company or any Subsidiary is a lender, borrower or guarantor;

(vi)  any contract or commitment restricting the Company, any Subsidiary or, to the Knowledge of the Company, any of their respective employees from engaging in any activity or line of business or competing with any Person;

(vii)  any joint venture, stockholders', partnership or similar agreement;

(viii)  any alliance, cooperation, research, development, distributorship, sales agency, sales representative, marketing or reseller agreement related to the business or technology of the Company that creates an obligation on the part of the Company or any Subsidiary in excess of $50,000.

- 22 -

(ix)    (A) any personal property lease or sublease (where the Company or any Subsidiary is either a lessor, lessee, sublessee or sublessor) that involves the payment in excess of $50,000 on an annual basis and cannot be terminated within 60 days without penalty or further obligation by the Company or any Subsidiary, (B) any contract for the purchase or sale of any real estate or any interest therein (where the Company or any Subsidiary is either Seller or Buyer), or (C) any option, right of first refusal, call right, or similar rights or commitment with, or held by, any third party to acquire, use or have access to any assets or properties, or any interest therein, of the Company or any Subsidiary;

(x)    any employment, severance or consulting contract;

(xi)    any material license, sublicense, development, support or maintenance agreement that is principally related to intellectual property;

(xii)    except as set forth in Section 3.2(a) of the Disclosure Schedule, any agreement relating to common or preferred stock issued by the Company or any Subsidiary;

(xiii)    except as set forth in Section 3.2(a) of the Disclosure Schedule, any agreement which provides rights to parties other than the Company or any Subsidiary which are contingent upon a merger, consolidation or other "change-in-control" of the Company;

(xiv)    any agreement containing confidentiality and non-disclosure obligations from the Company which, if violated, could reasonably be expected to result in a Material Adverse Effect;

(xv)    any agreement requiring the Company or any of its Subsidiaries to deal exclusively with another Person;

(xvi)    any contract or commitment requiring the Company or a Subsidiary or any of their Affiliates to purchase any goods or services on a "requirements" basis and in amounts in excess of $50,000 per year;

(xvii)    any agreement with a United States federal defense, military or intelligence agency or instrumentality involving payments in excess of $50,000; or

(xviii)    any agreement relating to the acquisition by or disposition of any business under which any claim for indemnification has been made or, to the Knowledge of the Company, threatened or which could be asserted by the Company or, to the Knowledge of the Company, any other party thereto.

(b)    The agreements listed in Section 3.12 of the Disclosure Schedule are all the material agreements relating to the ownership or operation of the currently conducted and contemplated business of the Company or to the property presently held or used by the

- 23 -

Company or any Subsidiary or to which the Company or any Subsidiary is a party or to which it or any of its properties and assets is subject or bound. The Company has previously delivered (or made available) true, complete and correct copies of all such agreements (including all amendments) to SBT (or, in the case of oral agreements only, true, complete and correct descriptions thereof have been set forth in Section 3.12 of the Disclosure Schedule). Each agreement listed in Section 3.12 of the Disclosure Schedule is valid, binding and enforceable against the Company and/or its Subsidiaries and each other party thereto (except to the extent enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors rights generally and by the effect of general principles of equity, regardless of whether enforcement is considered in a proceeding in equity or at law) and neither the Company nor any Subsidiary is or, to the Knowledge of the Company, is alleged to be, and, to the Knowledge of the Company, no other party to any such agreement is, in default in any material respect under any such agreement and, except as contemplated by this Agreement, after the Merger all of such agreements will remain in full force and effect (subject to obtaining the consents described in Sections 3.4 and 6.1(c) of the Disclosure Schedule), except for agreements which, by their terms (without giving effect to the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby), terminate prior to the consummation of the Merger. No additional consideration shall be due under such contracts as a result of the Merger and neither the Company nor any Subsidiary is currently renegotiating any such agreement or paying liquidated damages in lieu thereof.

Section 3.13. Project Backlog. Attached as Section 3.13 of the Disclosure Schedule is a list (the "Project Backlog Report") of each open customer job of the Company or any Subsidiary providing for the future performance by the Company or such Subsidiary of services to such customer, and which job is accounted for in the Interim Financial Statements under the "Percentage of Completion" accounting method (each an "Open Job"). The Project Backlog Report sets forth for each Open Job as of March 31, 2001, the budgeted amounts of contract revenue, costs for materials, subcontractor costs and labor costs. The parties agree that any variances from such budgeted amounts shall not ipso facto be deemed to breach this Section 3.13, it being understood that this sentence shall not derogate from any rights of SBT or Acquisition under any other provision of this Agreement including Section 3.12(a). The categories of expenses set forth in the Project Backlog Report reflect, in all material respects, the categories of expenses that are necessary to complete the Open Jobs to which they relate. Except as set forth in Section 3.13 of the Disclosure Schedule, each Open Job is subject to a valid and binding contract which is in full force and effect or a bona fide purchase order or other similar commitment, and there has been no claim by any customer, and, to the Knowledge of the Company, no threat by any customer of any failure by such customer to fulfill its obligations under such contract. The Company's budgets for the total costs for material, subcontractor costs and labor for each Open Job are established through methods and practices described in Section 3.13 of the Disclosure Schedule and consistently applied. Within five (5) business days following a written request by SBT, the Company shall deliver to SBT an updated Project Backlog Report (the "Updated Project Backlog Report") dated as of the last day of the next preceding calendar month; provided that if the Company, using its reasonable best efforts, is

- 24 -

unable to prepare the Updated Project Backlog Report dated as of the last day of the next preceding calendar month, the Updated Project Backlog Report may be dated as of the last day of the second preceding calendar month. Any Updated Project Backlog Report requested by, and so delivered to SBT, shall be deemed to be included in Section 3.13 of the Disclosure Schedule.

Section 3.14. Litigation. (a) Except as set forth on Section 3.14 of the Disclosure Schedule: (i) there are no legal actions, suits, arbitrations, or legal or administrative proceedings pending or, to the Company's knowledge, threatened against the Company or any Subsidiary or any of the assets or properties of the Company or any Subsidiary; (ii) neither the Company nor any Subsidiary nor any of the assets or properties of the Company or of any Subsidiary is the subject of any pending or, to the Knowledge of the Company, threatened investigation by any Governmental Entity; and (iii) neither the Company nor any Subsidiary nor the assets, properties or business of the Company or any Subsidiary is subject to any judgment, order, writ, injunction or decree of any court, governmental agency or arbitration tribunal. Neither the Company nor any Subsidiary is the plaintiff in any such proceeding and neither the Company nor any Subsidiary is contemplating commencing legal action against any other Person.

(b)     There are no actions, suits, arbitrations, legal or administrative proceedings pending or, to the Company's knowledge, threatened against any of the officers or directors of the Company or any Subsidiary for which the Company or any Subsidiary may have an obligation to provide indemnification.

(c)     The Company has provided SBT with a list setting forth generally a description of settlements occurring since December June 30, 1997, regarding actual or threatened lawsuits (excluding workers' compensation claims) binding on the Seller and/or its Subsidiaries.

Section 3.15. Compliance with Law; Authorizations. (a) The Company and each Subsidiary have complied, and the assets and properties of the Company and each Subsidiary are in compliance, in all material respects with, and is not in material violation of any law, ordinance, code or governmental rule or regulation (collectively, "Laws") to which it or its business is subject.

(b)     Except for the applications listed in Section 3.15 of the Disclosure Schedule, the Company and each Subsidiary has obtained and currently holds all material licenses, permits, certificates or other governmental authorizations (collectively "Authorizations") necessary for the ownership or use of its assets and properties and the conduct of its business, and all Authorizations are in full force and effect.

(c)     The Company and each Subsidiary has complied in all material respects with, and is not in violation in any material respect of, any Authorization necessary for the ownership or use of its assets and properties or the conduct of its business, and there are no proceedings pending or, to the Company's knowledge, threatened that seek the revocation, cancellation, suspension or any adverse modification of any such Authorizations presently possessed by the Company or its Subsidiaries.

Section 3.16.  Intellectual Property.

(a)     Except as set forth in Section 3.16(a) of the Disclosure Schedule, the Company has full legal right, title and interest in and to, or otherwise has the right to use without payment to any Person, all copyrights, know-how, patents, inventions, trade secrets, proprietary computer software, data bases, domain name registrations, and compilations, trademarks, service marks, trade names, licenses (other than licenses for off-the-shelf software that can be purchased for $5,000 or less), sublicenses and other intellectual property used or held for use in the business of the Company and the Subsidiaries as conducted and as proposed to be conducted (collectively, the "Intellectual Property").

(b)     Section 3.16(b) of the Disclosure Schedule contains a complete and accurate list of all licenses, sublicenses, consents and other agreements (whether written or otherwise) (i) pertaining to any Intellectual Property used by the Company and any Subsidiary in the conduct of its business, and (ii) by which the Company and any Subsidiary licenses or otherwise authorizes a third party to use such Intellectual Property.  None of the Company, any Subsidiary or, to the Knowledge of the Company, any other party is in breach of or default under any such license, sublicense, consent or other agreement, and except as set forth on Section 3.16(b) of the Disclosure Schedule, each such license, sublicense, consent or other agreement is now and immediately following the Effective Time shall be valid and in full force and effect.

(c)     Except as set forth on Section 3.16(c) of the Disclosure Schedule, the business of the Company and the Subsidiaries, as presently conducted, and the unrestricted conduct and the unrestricted use and exploitation of the Intellectual Property, does not infringe, dilute, misappropriate or otherwise violate any rights held or asserted by any Person, and no Person is infringing on the Intellectual Property.  Except as set forth in Section 3.16(c) of the Disclosure Schedule, the Company and any applicable Subsidiary has not given any indemnification to any Person against infringement of such intellectual property rights.

(d)  .  :  The rights of the Company and the Subsidiaries in the Intellectual Property are valid and in full force and effect, are held of record in the name of the Company or the applicable Subsidiary free and clear of all liens, encumbrances and other claims, and are not the subject of any pending or, to the Knowledge of the Company, threatened action for opposition, cancellation or reexamination proceeding, or any other proceeding challenging their extent or validity.

(e)     To the Knowledge of the Company, none of the material trade secrets, know-how or other confidential or proprietary information of the Company or any Subsidiary has been disclosed to any Person unless such disclosure was necessary and made pursuant to an appropriate confidentiality agreement.

(f)     All computer software owned or created by the Company or any Subsidiary, including without limitation, any separately sold component elements of such computer software (the "Owned Software"), consists entirely of material (i) which was created as a work for hire (as defined under U.S. copyright law) by a person or persons who were at the

- 26 -

time of creation the regular, full-time, salaried employees of the Company or any Subsidiary, the copyright in which is now owned by the Company or any Subsidiary or (ii) to which the copyright ownership was fully and irrevocably transferred to the Company or a Subsidiary pursuant to a written agreement executed by the authors or authors. No party holds any right, title or interest in or to the Owned Software (except such rights as may be granted under licenses granted in the normal course of business to third parties solely to use the Owned Software for the internal business of such third parties). Neither the Company nor any Subsidiary has, directly or indirectly, delivered, transferred, promised or otherwise disclosed to any third party the source code for any Owned Software, except in connection with a standard commercial source code escrow agreement executed in the normal course of business, and to the knowledge of Company and any Subsidiary, no such delivery or disclosure to a third party has been made.

(g)     Except as set forth on Section 3.16(g) of the Disclosure Schedule, all of the computer software used in the business is fully and adequately documented and performs in material conformance with the applicable documentation or specifications for such software. The Company and its Subsidiaries have taken commercially reasonable steps, including periodic testing or screening, to ensure that the computer software owned or used by them, will consistently and accurately interpret, calculate, manipulate, store and exchange date/time data from, into, and between the twentieth and twenty-first centuries, and does not contain any viruses, "worms," cancelbots, disabling or malicious code, or other anomalies that would materially impair the functionality of the computer software.

Section 3.17.   Tax Matters.

(a)     Except as set forth in Section 3.17(a) of the Disclosure Schedule: (i) The Company and each Subsidiary have timely filed all Income Tax Returns and all other Tax Returns required to be filed; (ii) all such Tax Returns are true, complete and accurate and all Taxes required to be paid with respect to such Tax Returns or otherwise due have been timely paid; (iii) neither the Company nor any Subsidiary has waived or has been requested in writing to waive (or agreed to any extension of) any limitations period in respect of Taxes; (iv) no adjustment relating to such Tax Returns has been proposed in writing by any Tax authority (insofar as it relates to the activities or income of the Company or any Subsidiary); (v) there are no pending or, to the Knowledge of the Company, threatened actions or proceedings for the assessment or collection of Taxes against the Company or any Subsidiary; (vi) the Company is not a party to any Tax sharing or Tax allocation agreement, and has no obligation under any Tax indemnity arrangement; (vii) there are no liens for Taxes upon the assets of the Company or any Subsidiary (other than liens for property taxes not yet due and payable); (viii) all Taxes which the Company or any Subsidiary is required by law to withhold or to collect for payment have been duly withheld and collected, and have been paid or accrued, or reserved against and entered on the books of the Company or such Subsidiary in accordance with GAAP; (ix) neither the Company nor any Subsidiary is a party to any agreement or arrangement that would result, separately or in the aggregate, in the payment of any "excess parachute payments" within the meaning of Section 280G of the Code; (x) no acceleration of the vesting schedule for any property that is substantially unvested within the meaning of the regulations under Section 83 of

the Code will occur in connection with the transactions contemplated by this Agreement, except as such acceleration is contemplated pursuant to Sections 2.1(e) and 2.1(f) herein; and (xi) the Company has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(b)    The Company (i) has not agreed to and is not required to make any adjustment pursuant to Section 481(a) of the Code; (ii) has no knowledge that the Internal Revenue Service ("IRS") has proposed any such adjustment or change in accounting method with respect to the Company; and (iii) does not have any application pending with the IRS or any other tax authority requesting permission for any change in accounting method.

(c)    Neither the Company nor any Subsidiary has income reportable for a period beginning after the Effective Time but attributable to a transaction which resulted in the reporting of such income for financial accounting purposes in a period ending on or prior to the Effective Time, except with respect to items where a deferred tax liability is reflected on the Interim Financial Statements with respect to the Taxes relating thereto.

(d)    (i) There are no written requests for information from any Tax authority currently outstanding that could affect the Taxes of the Company or any Subsidiary; (ii) there are no proposed reassessments in writing of any property owned by the Company or any Subsidiary that could increase the amount of any Tax to which the Company or any Subsidiary would be subject and (iii) no power of attorney that is currently in force has been granted by the Company or any Subsidiary with respect to any matter relating to Taxes.

(e)    (i) Section 3.17(e) of the Disclosure Schedule contains a complete and accurate list of the jurisdictions in which income, payroll, and sales and use Tax Returns have been filed, indicates the most recent Tax Return for each relevant jurisdiction for which an audit has been completed and indicates all Tax Returns that currently are the subject of audit; and (ii) the Company has delivered or made available to SBT correct and complete copies of all Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by the Company and any Subsidiary for the past five taxable years.

(f)    Except in respect of the affiliated, consolidated, combined, unitary or similar group of which the Company or any Subsidiary currently is a member, neither the Company nor any Subsidiary (i) is or has been a member of an affiliated group (within the meaning of Section 1504(a)(1) of the Code) or (ii) has filed or been required to file or been included on or required to be included on a consolidated federal income tax return or any state Tax Return on a consolidated, combined or unitary basis.

(g)    The provisions for Taxes reflected on the balance sheet included in the Interim Financial Statements are sufficient to cover all liabilities in respect of Taxes for all periods through March 31, 2001 (without regard to the materiality thereof).

(h)     Neither the Company nor any Subsidiary (i) owns an interest in any domestic international sales corporation, foreign sales corporation, controlled foreign corporation, or passive foreign investment company; (ii) has or is currently projected to have an amount includable in its income for the current taxable year under Section 951 or Section 551 of the Code, (iii) has an unrecaptured overall foreign loss within the meaning of Section 904(f) of the Code or (iv) has participated in or cooperated with an international boycott within the meaning of Section 999 of the Code.

(i)     Neither the Company nor any Subsidiary is a party (other than as an investor) to any industrial development bond.

Section 3.18.  Employee Benefit Plans.  (a) Section 3.18(a) of the Disclosure Schedule contains a complete and accurate list and description of all "employee pension benefit plans" (as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) (sometimes referred to as "Pension Plans"), "employee welfare benefit plans" (as defined in Section 3(1) of ERISA) (sometimes referred to as "Welfare Plans") and all other Benefit Plans (together with the Pension Plans and Welfare Plans, the "Plans") maintained, or contributed to, during the past two years by the Company or any Person that, together with the Company, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code (the Company and each such other Person, a "Commonly Controlled Entity") for the benefit of any current or any former employees, officers, consultants or directors of the Company.  The Company has made available to SBT true, complete and correct copies of (i) each Plan, (ii) the most recent summary plan description for each Plan for which a summary plan description is required, (iii) each trust agreement and group annuity contract relating to any Plan and (iv) all material correspondence with the IRS or the United States Department of Labor relating to any outstanding controversy or audit.  Each Plan has been administered in accordance with its terms.  The Company and all Plans are in compliance with applicable provisions of ERISA and, with respect to the Plans, the Code.  Except as disclosed in Section 3.18(a) of the Disclosure Schedule, all annual reports on Form 5500 required to be filed with the Internal Revenue Service with respect to each Plan for which such reports are required, have been duly and timely filed.

(b)     All Pension Plans that are intended to be qualified under Section 401(a) of the Code have been the subject of determination, opinion, notification or advisory letters from the IRS to the effect that such Pension Plans are so qualified and are exempt from Federal income taxes under Section 501(a) of the Code, unless the remedial amendment period under Section 401(b) of the Internal Revenue Code with respect to such Plan remains open, and an application for such a determination letter has been filed with the Internal Revenue Service and no such determination letter has been revoked nor has any event occurred since the date of such Plan's most recent determination letter that could reasonably be expected to adversely affect its qualification.

(c)     Neither the Company nor any Commonly Controlled Entity has at any time since January 1, 1995, maintained, contributed to or been obligated to contribute to any

Plan that is subject to Title IV of ERISA including, without limitation any multi-employer plan (as defined in Section 3(37) of ERISA).

(d) Except as set forth in Section 3.18 of the Disclosure Schedule, neither the Company nor any Subsidiary has any liability or obligation under any Welfare Plan to provide life insurance or medical or health benefits after termination of employment to any employee or dependent other than as required by Part 6 of Title I of ERISA. Except as set forth on Section 3.18(d) of the Disclosure Schedule, no Plan that provides health or medical benefits are self-insured, and no claims for such benefits could result in an uninsured liability to the Company, any Subsidiary, the Surviving Corporation or SBT.

(e) Except as provided by this Agreement and as set forth in Section 3.18(e) of the Disclosure Schedule, no employee of the Company or any Subsidiary will be entitled to any additional compensation or benefits or any acceleration of the time of payment or vesting of any compensation or benefits under any Plan as a result of the transactions contemplated by this Agreement.

(f) Neither the Company nor any Subsidiary has engaged in any non-exempt prohibited transactions under ERISA and there are no violations or claims relating to the Plans except in the ordinary course of business.

(g) There is no investigation by any governmental or regulatory authority or any proceeding or other claim, action (other than claims for benefits in the normal operations of the Benefit Plans), suit or proceeding against or involving any Benefit Plan or asserting any right or claim to benefits.

(h) All contributions, premiums and other payments required by law or any Plan or applicable collective bargaining agreement to have been made under any such Plan or agreement to any fund, trust or account established thereunder or in connection therewith have been made by the due date thereof.

(i) Without limiting any other provision of this Section 3.18 and except as set forth on Section 3.18(i) of the Disclosure Schedule, no event has occurred and no condition exists, with respect to any Plan (whether or not maintained by the Company or the Surviving Corporation), that has subjected or could subject the Company, any Subsidiary, the Surviving Corporation or SBT, or any Plan or any successor thereto, to any material tax, fine, penalty or other liability (other than, in the case of the Company, the Subsidiaries and the Plans, a liability arising in the normal course to make contributions or payments, as applicable, when ordinarily due under a Plan with respect to employees or former employees of the Company or any Subsidiary). SBT, and its Affiliates, including on and after the Closing, the Surviving Corporation, shall have no material liability for, under, with respect to or otherwise in connection with any employee plan, which liability arises under ERISA or the Code, by virtue of the Company or any Subsidiary being aggregated in a controlled group or affiliated service group with any Commonly Controlled Entity for purposes of ERISA or the Code at any relevant time prior to the Closing. Each Plan may be amended and terminated in accordance with its terms.

- 30 -

As of the Effective Time, no Plan will have any participants who are not employees of the Company or its Subsidiaries.

Section 3.19.    Employee Compensation.    The Company has previously delivered to SBT a complete and accurate list (organized by individual for persons whose annual rate of compensation exceeds $75,000 and by category for all other persons) of the titles and current annual salary rates of and has set forth on Section 3.19 of the Disclosure Schedule all regular bonuses paid or payable or other bonuses paid or payable within the past 12 months to all present officers, employees, consultants, contractors and other individuals who perform services for the Company or any Subsidiary ("Employees").

Section 3.20.    Employees.

(a)        (i) The Company and each of its Subsidiaries has complied in all material respects with all applicable laws, rules and regulations respecting employment and employment practices, terms and conditions of employment, wages and hours, and neither the Company nor any Subsidiary is liable for any arrears of wages or any taxes or penalties for failure to comply with any such laws, rules or regulations; (ii) the Company believes that its relations with each of its employees is satisfactory; (iii) except as set forth in Section 3.20 of the Disclosure Schedule, there are no legal actions, proceedings, arbitrations or mediations pending or, to the Knowledge of the Company, threatened between the Company or any of its Subsidiaries and any of their respective employees; (iv) neither the Company nor any Subsidiary is a party to any collective bargaining agreement or other labor union contract applicable to persons employed by the Company or such Subsidiary, nor, to the Knowledge of the Company, are there any activities or proceedings of any labor union to organize any such employees; (v) there are no unfair labor practice complaints pending or, to the Knowledge of the Company, threatened against the Company or any Subsidiary before the National Labor Relations Board or any current union representation questions involving employees of the Company or any Subsidiary; (vi) there is no strike, slowdown, work stoppage or lockout existing, or, to the Knowledge of the Company, threatened, by or with respect to any employees of the Company or any Subsidiary; (vii) except as set forth in Section 3.20 of the Disclosure Schedule, no charges are pending or to the Knowledge of the Company threatened before the Equal Employment Opportunity Commission or any state, local or foreign agency responsible for the prevention of unlawful employment practices with respect to the Company or any Subsidiary; (viii) there are no claims pending against the Company or any Subsidiary before any workers' compensation board; and (ix) neither the Company nor any Subsidiary has received notice that any federal, state, local or foreign agency responsible for the enforcement of labor or employment laws intends to conduct an investigation of or relating to the Company or any Subsidiary and, to the Knowledge of the Company, no such investigation is in progress.

(b)        The Company and each Subsidiary has properly classified for all purposes (including, without limitation, for all Tax purposes and for purposes of determining eligibility to participate in any employee benefit plan) all employees, leased employees, consultants and independent contractors, and has withheld and paid all applicable Taxes and

made all appropriate filings in connection with services provided by such persons to the Company and each Subsidiary.

(c)    The Company and each Subsidiary have obtained representations from each of their respective employees hired within the past 24 months that they are not bound by any contract or commitment that restricts them from engaging in any activity or competing with any Person, and to the Knowledge of the Company no employee of the Company or any Subsidiary is bound by any such agreement. Each mid-level management employee listed in Section 3.20(c) of the Disclosure Schedule has, as indicated in Section 3.20(c) of the Disclosure Schedule, either signed the Company's standard non-competition agreement so indicated in the Disclosure Schedule and each such non-competition agreement remains in full force and effect, or the Company shall use reasonable efforts to cause all such employees to sign SBT's Standards of Conduct Agreement prior to Closing. True and correct copies of such agreements have been provided to SBT.

Section 3.21.    _Environmental Laws_. Neither the Company nor any Subsidiary is in violation of, any reporting or other requirements under any Environmental Law to which it or its assets, properties, personnel or business are subject. Neither the Company nor any Subsidiary has knowledge of any circumstances or conditions existing that may prevent or interfere with such compliance in the future. The Company and each Subsidiary are not required to have any permits, licenses and other authorizations under Environmental Laws. There is no Environmental Claim pending or, to the Knowledge of the Company, threatened against the Company or any Subsidiary. There are no past or present actions, activities, circumstances, conditions, events or incidents taken or caused by the Company or any of its Subsidiaries, or, to the Knowledge of the Company, any other Person, including, without limitation, the release, emission, discharge, storage, transportation, generation, presence or disposal of any Hazardous Substance that could reasonably be expected to result in any material Environmental Claim against the Company or any Subsidiary. There are no surveys, reports, assessments, audits, evaluations or other documents relating to the presence, migration or disposal of any Hazardous Substance or compliance with Environmental Laws by the Company or any Subsidiary, prepared for or at the request of the Company or any Subsidiary or relating to the Company, any Subsidiary or any of their respective assets, properties or businesses and in the possession or control of the Company or any Subsidiary.

Section 3.22.    _Insurance_. Set forth in Section 3.22 of the Disclosure Schedule is a complete and accurate list of all liability, property, workers' compensation, directors' and officers' liability, "key man" life and other insurance policies in effect that are owned by the Company or any Subsidiary, or under which the Company or any Subsidiary is a named insured. Those policies and the coverage thereunder are in full force and effect, and all premiums due and payable thereon have been paid in accordance with their terms. No insurer under any such policy has cancelled or generally disclaimed liability under any such policy or indicated any intent to do so or to materially increase the premiums payable under or not renew any such policy. All material claims of which notice has been given by the Company or a Subsidiary to an insurance company under any of the Insurance Policies filed in each of 2001 (through

June 6, 2001), 2000, 1999 and 1998 (other than medical claims) are listed in Section 3.22 of the Disclosure Schedule and have been filed in a timely fashion, and, other than as described in Section 3.22 of the Disclosure Schedule, neither the Company nor any Subsidiary has received written notice denying coverage with respect to any such claims, and no other such claims are outstanding. Neither the Company nor any Subsidiary has incurred any loss or received notice of any claim that would have been covered by insurance but for the failure to provide the insurer of adequate notice.

Section 3.23. <u>Bank Accounts, Letters of Credit and Powers of Attorney</u>. Section 3.23 of the Disclosure Schedule contains a complete and accurate list of (a) all bank accounts, lock boxes and safe deposit boxes relating to the business and operations of each of the Company and its Subsidiaries (including the name of the bank or other institution where such account or box is located and the name of each authorized signatory thereto), (b) all outstanding letters of credit issued by financial institutions for the account of the Company and each Subsidiary (setting forth, in each case, the financial institution issuing such letter of credit, the maximum amount available under such letter of credit, the terms (including the expiration date) of such letter of credit and the party or parties in whose favor such letter of credit was issued), and (c) the name and address of each Person who has a power of attorney to act on behalf of the Company or any Subsidiary. The Company has heretofore delivered or made available to SBT true, correct and complete copies of each letter of credit and each power of attorney described on Section 3.23 of the Disclosure Schedule.

Section 3.24. <u>No Adverse Development</u>. To the Knowledge of the Company, since March 31, 2001 there has been no event, circumstance, state of affairs, condition or development which has had or could reasonably be expected to have a Material Adverse Effect.

Section 3.25. <u>Transactions with Affiliates</u>. Except for (i) payments to Stockholders that are or will be included in the Closing Debt Amount and/or will be included in and payable out of the Stockholders' Representative Expense Amount and (ii) transactions involving the compensation of employees pursuant to the arrangements listed in Section 3.12 of the Disclosure Schedule, every transaction between the Company and any of its Affiliates or their "associates" (as such term is defined in the rules and regulations of the SEC), which is currently in effect is set forth on Section 3.25 of the Disclosure Schedule and, except as noted in Section 3.25 of the Disclosure Schedule, each such agreement set forth in such Schedule shall terminate on the Effective Time.

Section 3.26. <u>Relationship with Customers and Suppliers</u>. (a) Neither the Company nor any Subsidiary has received any written or, to the Knowledge of the Company, oral communication or notice of any fact, event or action, from, and to the Company's knowledge, there has not occurred or been threatened any action by, any Significant Customer with whom the Company or any Subsidiary has a contract or agreement stating that such Significant Customer has ceased, or will cease (except in connection with the termination of outstanding jobs upon their completion in the ordinary course or the expiration of existing contracts in accordance with their terms), to use the products, equipment, goods or services of the Company

or any Subsidiary, or has substantially reduced or will substantially reduce, the use of such products, equipment, goods or services at any time or will otherwise materially and adversely modify its business relationship with the Company or any Subsidiary. "Significant Customer" shall mean any customer to whom the Company and its Subsidiaries has made or is reasonably expected to make sales in excess of $1,000,000 in any rolling 12 month period, or any group of customers to whom the Company and its subsidiaries has made or is reasonably expected to make sales in the aggregate in excess of $5,000,000 in any rolling 12 month period.

(b)    Neither the Company nor any Subsidiary has received any written or oral communication or notice of any fact, event or action, from, and to the Company's knowledge, there has not occurred or been threatened any action by, any Significant Supplier with whom the Company or any Subsidiary has a contract or agreement stating that such Significant Supplier has ceased, or will cease, to deliver the products, equipment, goods or services used by the Company or any Subsidiary, or has substantially reduced or will substantially reduce, the delivery of such products, equipment, goods or services at any time or will otherwise materially and adversely modify its business relationship with the Company or any Subsidiary. "Significant Supplier" shall mean any supplier from whom the Company and its Subsidiaries has made or is reasonably expected to make purchases in excess of $500,000 in any rolling 12 month period or any group of suppliers to whom the Company and its Subsidiaries has made or is reasonably expected to make purchases in the aggregate in excess of $2,500,000 in any rolling 12 month period.

Section 3.27.    Brokers.    Except for Credit Suisse First Boston, Mallon Associates and EBS Consulting, whose fees, commission and expenses are the sole responsibility of the Company and will be included in the Closing Debt Amount and/or included in and payable out of the Stockholders' Representative Expense Amount, all negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by the Company directly with SBT and Acquisition without the intervention of any Person on behalf of the Company in such manner as to give rise to any valid claim by any Person against SBT, Acquisition, the Company or any Subsidiary for a finder's fee, brokerage commission or similar payment.

Section 3.28.    Absence of Questionable Payments.    Except as set forth in Section 3.28 of the Disclosure Schedule, neither the Company nor, to the Company's knowledge, any of its directors, officers, agents, employees or any other Persons acting on their behalf has, in connection with the operation of the Business, (i) used any corporate or other funds for unlawful contributions, payments, gifts or entertainment, or made any unlawful expenditures relating to political activity to government officials or established or maintained any unlawful or unrecorded funds in violation of Section 104 of the Foreign Corrupt Practices Act of 1977, as amended, or any other applicable foreign, federal or state law; or (ii) accepted or received any unlawful contributions, payments, expenditures or gifts.

Section 3.29.    Product Liability.

(a)    Section 3.29 of the Disclosure Schedule sets forth a summary of each Product Liability Claim (as defined below) in excess of $50,000 paid by or on behalf of the

Company during the past three fiscal years, and each outstanding Product Liability Claim in excess of $50,000. To the Company's knowledge, there are no design or manufacturing defects in products manufactured or sold prior to date of this Agreement that would result in any liability, cost or expense of Acquisition or the Company in respect of such products, and each product manufactured, sold, leased out or delivered by the Company prior to the date of this Agreement has, to the Company's knowledge, been manufactured, sold, leased out or delivered in such a manner as not to result in any liability, cost or expense of Acquisition or the Company with respect to such product and in conformity with all applicable contractual commitments and all express and implied warranties. For purposes of this Section 3.29, the term "Product Liability Claim" shall mean any claim arising out of any injury to an individual or property as a result of the ownership, possession, or use of any product manufactured, sold, or delivered by the Company or a Subsidiary.

(b)     Section 3.29 of the Disclosure Schedule sets forth a summary of each Product Recall since January 1, 1998, describing in each case the nature of the problem giving rise to such recall, whether such recall was voluntary or by order of a Governmental Entity, the number of products recalled, and the aggregate costs incurred for each such Product Recall. For purposes of this Section 3.29, the term "Product Recall" shall mean any recall of filled products available to end-users and any recall of unfilled products other than returns and recalls of unfilled products in the ordinary course of business consistent with past practice, in any case, arising out of or related to a defect in a product manufactured or sold by the Company or a Subsidiary.

Section 3.30.  Disclosures.  No representation or warranty made by Company, the Subsidiaries or the Stockholders in this Agreement or in any Certificate delivered pursuant to Section 6.1(a), nor any statement or disclosure in the Disclosure Schedule contains any untrue statement of material fact or omits any material fact necessary to make the statements contained herein or therein not misleading.

ARTICLE IIIA  REPRESENTATIONS AND WARRANTIES OF THE STOCKHOLDERS.

Each of the Stockholders severally represents and warrants to Acquisition and to SBT as follows:

Section 3A.1.  Ownership.  Except as set forth in Section 3.2(a) of the Disclosure Schedule, such Stockholder is the record and beneficial owner of the number of Shares of Company Common Stock, Convertible Notes and Options (including the Company Common Stock issuable upon the conversion or exercise thereof) set forth on the signature page to this Agreement (the "Stockholder Securities"), and such Stockholder owns such Stockholder Securities free and clear of all Liens. Such Stockholder does not own any Company securities other than the Stockholder Securities. Such Stockholder has sole voting power and sole power to issue instructions with respect to the voting of his, her or its respective Stockholder Securities, sole power of disposition, sole power of exercise or conversion and the sole power to demand appraisal rights, in each case with respect to all of his, her or its respective Stockholder

- 35 -

Securities.  On the effective date of the written consent in lieu of a meeting obtained in accordance with the provisions of the DGCL, pursuant to which the Merger and this Agreement have been approved, such Stockholder had sole voting power and sole power to issue instructions with respect to the voting of all of his, her or its respective Stockholder Securities, sole power of disposition, sole power of exercise or conversion and the sole power to demand appraisal rights, in each case with respect to all of his, her or its respective Stockholder Securities.  The Stockholder Securities are now and, at all times during the term hereof, will be held by such Stockholder, or by a nominee or custodian for the benefit of such Stockholder, free and clear of all Liens.  At the Effective Time, all of Such Stockholder's Convertible Notes then outstanding, if any, will be converted into the number of shares of Company Common Stock each such Convertible Note is convertible for, in accordance with Section 3.2 of the Disclosure Schedule and Sections 2.1(f) and 2.1(g).  Such Stockholder does not have any claim that shares of capital stock have been issued by the Company at any time in violation of the preemptive rights of such Stockholder.  Except as set forth on Section 3.2(a) of the Disclosure Schedule, there are no existing agreements, subscriptions, options, warrants, calls, commitments, trusts (voting or otherwise), or rights of any kind whatsoever between the Stockholder and any Person, granting any interest in or the right to purchase or otherwise acquire from the Stockholder or granting to the Stockholder any interest in or the right to purchase or otherwise acquire from any Person, at any time, or upon the occurrence of any stated event, any securities of the Company, whether or not presently issued or outstanding.  .  Except as set forth on Section 3.2(a) of the Disclosure Schedule, there are no proxies, agreements or understandings with respect to the voting of the shares of Company Common Stock to which such Stockholder is a party or any agreements, subscriptions, options, warrants, calls, commitments or rights of any kind granting to any Person the right to purchase or otherwise acquire from such Stockholder any securities of the Company.  Section 3.2(b) of the Disclosure Schedule sets forth the exercise or strike price of each outstanding Option held by such Stockholder and the number of Shares into which each Convertible Note held by such Stockholder is convertible.

Section 3A.2.  Authority.     Each such Stockholder has the full power and authority to enter into and perform all of such Stockholder's obligations under this Agreement and the Escrow Agreement.  If the Stockholder is an individual, such Stockholder has the legal capacity to execute and deliver this Agreement and any Collateral Documents required to be executed and delivered by such Stockholder hereunder, and to consummate the transactions contemplated hereby and thereby.  If a Stockholder is an entity, the execution, delivery and performance by such Stockholder of this Agreement and any Collateral Documents required to be executed and delivered by such Stockholder hereunder, and of the transactions contemplated hereby and thereby and the performance of its obligations under this Agreement and such Collateral Documents have been duly authorized by all necessary corporate, partnership or trust action on the part of such Stockholder, and no other action on the part of such Stockholder is required to authorize the execution, delivery and performance of this Agreement or any Collateral Documents required to be executed and delivered by such Stockholder hereunder, or the consummation by such Stockholder of any of the transactions contemplated hereby and thereby. Each Stockholder has executed a written consent in accordance with Section 228 of the DGCL as a holder of Company Common Stock with respect to all Shares held of record by such

- 36 -

Stockholder approving this Agreement and the Merger in accordance with Section 251 of the DGCL. This Agreement is, and as of the Closing Date, the Collateral Documents (to the extent each such Stockholder is a party thereto or bound thereby) will be, the legal, valid and binding obligation of each of the Stockholders, enforceable against such Stockholder in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by the effect of general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law). Each Stockholder that is a holder of Convertible Notes has executed and delivered all instruments, consents and amendments that may be required to give effect to Section 2.1(g) and hereby agrees not to take any action that would cause such instruments, consents or amendments not to be in full force and effect at the Effective Time. Each Stockholder acknowledges that such Stockholder has been advised to seek representation by counsel in connection with the execution and delivery of this Agreement and the Collateral Documents (to the extent executed by such Stockholder) and the transactions contemplated hereby and thereby.

Section 3A.3.  No Conflicts; Governmental Requirements.  (a) The execution, delivery and performance by the Stockholder of this Agreement, the Collateral Documents required to be executed and delivered by such Stockholder hereunder and the consummation of the transactions contemplated hereby and thereby do not, and will not, (i) violate or conflict with any provision of the certificate of incorporation or by-laws or other organizational documents, if applicable, of such Stockholder (including without limitation any trust instruments), (ii) violate any law, rule, regulation, ordinance or applicable constitution or order, writ, injunction, judgment, award, restriction, ruling or decree of any court, arbitrator or federal, state, local or foreign governmental or regulatory entity (or any department, agency, authority or political subdivision thereof), or (iii) except as set forth on footnote 1 of Section 3.2(a) of the Disclosure Schedule, result in a violation or breach of, conflict with, or constitute a default (or an event which might, with the passage of time or the giving of notice, or both, constitute a default) under, or result in or give rise to any right of termination, modification, cancellation or acceleration, or require any consent, approval or notice under, any note, bond, indenture, license, lien, franchise, mortgage, loan or credit agreement, contract, agreement, lease, permit, guaranty or other agreement, instrument or obligation to which such Stockholder is a party or by which any of its assets or properties may be bound or affected.

(b)    Except for (i) the filing of a premerger notification report by the Company under the HSR Act, (ii) the filing of the Certificate of Merger pursuant to the DGCL and (iii) any other consents, approvals, authorizations, permissions, notices or filings which if not obtained or made could not, individually or in the aggregate, have a Material Adverse Effect or materially delay or render unlawful the consummation of the Merger or the other transactions contemplated by this Agreement and the Escrow Agreement, the execution and delivery of this Agreement and any Collateral Documents required to be executed and delivered by such Stockholder hereunder by such Stockholder does not, and the performance by the Stockholder of this Agreement and such Collateral Documents will not, require any consent, approval,

- 37 -

authorization or permission of, or filing with or notification to, any governmental or regulatory authority, domestic or foreign.

Section 3A.4. <u>Brokers</u>. Except for Credit Suisse First Boston, Mallon Associates and EBS Consulting, whose fees, commission and expenses are the sole responsibility of the Company and will be included in the Closing Debt Amount and/or included in and payable out of the Stockholders' Representative Expense Amount, all negotiations relative to this Agreement and the transactions contemplated hereby have been carried out without the intervention of any Person on behalf of such Stockholder in such manner as to give rise to any valid claim by any Person against SBT, Acquisition, the Company or any Subsidiary for a finder's fee, brokerage commission or similar payment.

Section 3A.5. <u>Knowledge</u>. Such Stockholder does not have actual knowledge of any breach of any representation or warranty of the Company contained herein.

ARTICLE IV  REPRESENTATIONS AND WARRANTIES OF SBT AND ACQUISITION.

SBT and Acquisition each represent and warrant to the Company as follows:

Section 4.1.    <u>Organization</u>. Each of SBT and Acquisition is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and has all requisite corporate power and authority to enter into and perform this Agreement and the transactions contemplated hereby to be performed by it.

Section 4.2.    <u>Corporate Authority</u>. Each of SBT and Acquisition has full corporate power and authority to execute and deliver this Agreement and the Escrow Agreement and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and the Escrow Agreement has been duly authorized and approved on the part of SBT and Acquisition by all necessary corporate action and, except for the filing of the Certificate of Merger pursuant to the DGCL, no other corporate proceedings on the part of either SBT or Acquisition is necessary to authorize this Agreement and the Escrow Agreement and the transactions contemplated hereby and thereby.  This Agreement has been, and as of the Closing Date the Escrow Agreement will be, duly authorized, executed and delivered by each of SBT and Acquisition.  This Agreement is, and as of the Closing Date the Escrow Agreement will be the legal, valid and binding obligation of each of SBT and Acquisition enforceable in accordance with their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors rights generally and by the effect of general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

Section 4.3.    <u>No Breach</u>. (a) The execution, delivery and performance by each of SBT and Acquisition of this Agreement and the Escrow Agreement and the consummation of the

Merger do not, and will not, (i) violate or conflict with any provision of the certificate of incorporation or by-laws of either SBT or Acquisition; (ii) violate any law, rule, regulation, ordinance or applicable constitution or order, writ, injunction, judgment, award, restriction, ruling or decree of any court, arbitrator or federal, state, local or foreign governmental or regulatory entity (or any department, agency, authority or political subdivision thereof), except for violations which, individually or in the aggregate, will not have a material adverse effect on SBT, Acquisition and their Subsidiaries taken as a whole, or (iii) result in a violation or breach of, conflict with, or constitute a default (or an event which might, with the passage of time or the giving of notice, or both, constitute a default) under, or result in or give rise to any right of termination, modification, cancellation or acceleration, or require any consent, approval or notice under, any material note, bond, indenture, license, lien, franchise, mortgage, loan or credit agreement, contract, agreement, lease, permit, guaranty or other agreement, instrument or obligation (written or oral) to which the SBT or Acquisition is a party or by which any of its assets or properties of SBT or Acquisition may be bound except for violations, breaches, conflicts or defaults which, individually or in the aggregate, will not have a material adverse effect on SBT and Acquisition taken as a whole.

(b)     Except for (i) the filing of a premerger notification report by SBT under the HSR Act, (ii) the filing of the Merger Certificate pursuant to the DGCL and (iii) any other consents, approvals, authorizations, permissions, notices or filings which if not obtained or made would not (individually or in the aggregate) materially impair SBT's ability to perform its obligations under this Agreement or the Escrow Agreement or have a material adverse effect on the Surviving Corporation, the execution and delivery of this Agreement and the Escrow Agreement by each of SBT and Acquisition does not and the performance by it of this Agreement and the Escrow Agreement will not, require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, domestic or foreign.

Section 4.4.    Brokers.  All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by SBT directly with the Company without the intervention of any Person on behalf of SBT in such manner as to give rise to any valid claim by any Person against SBT, Acquisition, the Company or any Subsidiary for a finder's fee, brokerage commission or similar payment, except for any such fees, commission or payments which will be paid by SBT.

Section 4.5.    Financing.  SBT has available sufficient cash in immediately available funds to make the payments required by Article II of this Agreement.

## ARTICLE V  COVENANTS AND ADDITIONAL AGREEMENTS.

Section 5.1.    Conduct of Business.  The Company covenants and agrees that at all times from and after the date of this Agreement until the Effective Time:

(a)     The Company and the Subsidiaries shall conduct their respective businesses only in, and shall not take any action except in, the ordinary course of business

- 39 -

consistent with past practice (except as expressly required or permitted by this Agreement, or to the extent that SBT otherwise shall consent in writing).

        (b)    Without limiting the generality of paragraph (a) of this Section 5.1, (1) the Company and its Subsidiaries shall use their reasonable best efforts to preserve intact their present business organizations and reputation, to keep available the services of their officers and employees, to maintain their assets and properties in good working order and condition, ordinary wear and tear excepted, to maintain insurance on their tangible assets and businesses in such amounts and against such risks and losses as are currently in effect, to preserve their relationship with customers and suppliers and others having significant business dealings with them and to comply in all material respects with all Laws and orders of all Governmental Entities applicable to any of them, and (2) neither the Company nor any of its Subsidiaries shall (except as expressly required or permitted by this Agreement, or except as set forth in Section 5.1 of the Disclosure Schedule, or except to the extent that SBT otherwise shall consent in writing):

        (i)    amend or propose to amend its certificate of incorporation or by-laws (or analogous organizational documents) except for amendments required by this Agreement;

        (ii)    (w) declare, set aside or pay any dividends on or make other distributions in respect of any of its capital stock, (x) split, combine, reclassify or take similar action with respect to any of its capital stock or issue or authorize or propose the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock, (y) adopt a plan of complete or partial liquidation or resolutions providing for or authorizing such liquidation or a merger, consolidation, restructuring, recapitalization or other reorganization (other than the approvals of the Merger required by the DGCL and this Agreement) or (z) directly or indirectly redeem, repurchase or otherwise acquire any shares of its capital stock or any option with respect thereto (except for repurchases pursuant to outstanding stock restriction agreements);

        (iii)    issue, deliver or sell, or authorize or propose the issuance, delivery or sale of, any shares of its capital stock or any option, warrant or similar right with respect thereto other than upon exercise or conversion of an Option or a Convertible Note outstanding on the date of this Agreement;

        (iv)    acquire (by merging or consolidating with, or by purchasing an equity interest in or a substantial portion of the assets of, or by any other manner) any business or any corporation, partnership, association or other business organization or division thereof or otherwise acquire or agree to acquire any assets other than the acquisition of assets in the ordinary course of business consistent with past practice;

        (v)    other than in the ordinary course of its business consistent with past practice, sell, lease, grant any security interest in or otherwise dispose of or encumber any of its properties or assets, tangible or intangible;

(vi)    except to the extent required by applicable law, (A) permit any change in (1) any practice or policy regarding pricing, marketing, purchasing, investment, accounting, financial reporting, inventory, credit, allowance or taxes or (2) any method of calculating any bad debt, contingency or other reserve for accounting, financial reporting or tax purposes or (B) make any material tax election or settle or compromise any material income tax liability with any Governmental Entity;

(vii)    except to the extent such incurrence would not be in violation of or require disclosure pursuant to the terms of this Agreement, incur (which shall be deemed to include entering into credit agreements, lines of credit or similar arrangements) indebtedness for borrowed money or guarantee any such indebtedness;

(viii)    except for the actions with respect to stock options and the Company Stock Plan expressly provided for in this Agreement, and except for the agreements to be terminated and entered into pursuant to Section 5.8, enter into, adopt, amend in any material respect (except as may be required by applicable law) or terminate (other than in accordance with its terms) any Benefit Plans or other agreement, arrangement, plan or policy between the Company and one or more of its directors, officers, employees or consultants, or increase in any manner the compensation or fringe benefits of any director, officer, employee or consultant or pay any benefit not required by any plan or arrangement in effect as of the date hereof;

(ix)    enter into any contract or amend or modify any existing contract, or engage in any new transaction outside the ordinary course of business consistent with past practice or not on an arm's length basis, with any Affiliate of the Company;

(x)    make any capital expenditures or commitments for additions to plant, property or equipment constituting capital assets in excess of $50,000 with respect to each such capital expenditure or commitment and not more than $1,000,000 in the aggregate;

(xi)    waive or agree to any extension of any limitations period in respect of Taxes;

(xii)    make any change in the lines of business in which it participates or is engaged;

(xiii)    take any action or omit to take any action that would be reasonably likely to result in a breach, violation or inaccuracy of any representation, warranty, covenant or agreement of the Company made in this Agreement;

(xiv)    except for contracts relating solely to the purchase and sale of goods and services to customers or from suppliers in the ordinary course of business, enter into any contract or agreement that would be required to be disclosed in Section 3.12 of the Disclosure Schedule;

(xv)    enter into any contract or agreement that would require the consent of the other party thereto to consummate the transactions contemplated hereby;

(xvi)    except as would not result in penalties or late charges or adversely affect the Company's and the Subsidiaries' relationships with suppliers, delay payment on or to fail to pay when due the trade accounts payable and other recurring expenses of the Company and its Subsidiaries;

(xvii)    except as would not adversely affect the Company's and the Subsidiaries' relationships with customers, accelerate the collection of accounts receivable of the Company and the Subsidiaries;

(xviii)    enter into, terminate or, other than in the ordinary course of business, amend, any lease or sublease of any real property or purchase or sell any real property or any interest therein; or

(xix)    enter into any contract, agreement, commitment or arrangement to do or engage in any of the foregoing.

(c)    Until the Effective Time, the Company shall confer on a regular and frequent basis with SBT and/or its Affiliates with respect to its business and operations and other matters relevant to the Merger, and shall promptly advise SBT, orally and in writing, of any change or event, including, without limitation, any complaint, investigation or hearing by any Governmental Entity (or communication indicating the same may be contemplated) or the institution or threat of litigation, having, or which, insofar as can be reasonably foreseen, could have, a Material Adverse Effect or materially and adversely affect the ability of the Company to consummate the transactions contemplated hereby.

Section 5.2.    No Solicitations.  Until the Effective Time, neither the Company nor any of its Subsidiaries shall authorize or permit any officer, director, employee, investment banker, financial advisor, attorney, accountant or other agent or representative (each, a "Representative") retained by or acting for or on behalf of the Company or any of its Subsidiaries to, directly or indirectly, initiate, solicit, encourage, or, participate in any negotiations regarding, furnish any confidential information in connection with, endorse or otherwise cooperate with, assist, participate in or facilitate the making of any proposal or offer for, or which may reasonably be expected to lead to, an Acquisition Transaction, by any Person, or group (a "Potential Acquiror").  The Company shall promptly inform SBT, orally and in writing, of the material terms and conditions of any proposal or offer for, or which may reasonably be expected to lead to, an Acquisition Transaction that it receives and the identity of the Potential Acquiror.  The Company will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted on or prior to the date of this Agreement heretofore with respect to any Acquisition Transaction.  As used in this Agreement, "Acquisition Transaction" means any merger, consolidation or other business combination involving the Company, or any acquisition in any manner of all or a substantial portion of the equity of, or all or a substantial portion of the assets of, the Company, whether for cash, securities or any other

- 42 -

consideration or combination thereof, other than pursuant to the transactions contemplated by this Agreement.

Section 5.3.    Access to Information; Confidentiality.  (a) The Company shall, throughout the period from the date hereof to the Effective Time, (i) provide SBT and its Affiliates and their respective Representatives with full access, upon reasonable prior notice, during normal business hours to all officers, employees, agents, accountants and customers of the Company and its Subsidiaries, and their respective assets, properties, books and records and (ii) furnish promptly to such persons (x) a copy of each report, statement, schedule and other document filed or received by the Company or any Subsidiary pursuant to the requirements of federal or state securities laws or filed with any other governmental or regulatory authority, and (y) all information and data (including, without limitation, copies of contracts, Benefit Plans and other books and records) concerning the business, employees and operations of the Company (including product development) and its Subsidiaries as SBT or any of such other persons reasonably may request.  No investigation pursuant to this paragraph or otherwise shall affect any representation or warranty contained in this Agreement or any condition to the obligations of the parties hereto.

(b)     Until the Effective Time, SBT will hold, and will use its best efforts to cause its Affiliates and their respective Representatives to hold, in strict confidence, unless (i) compelled to disclose by judicial or administrative process or by other requirements of applicable laws of governmental or regulatory authorities (including, without limitation, in connection with obtaining the necessary approvals of this Agreement or the transactions contemplated hereby of governmental or regulatory authorities); provided that to the extent reasonably practicable SBT shall provide the Company with reasonable notice of such compelled disclosure, or (ii) disclosed in an action or proceeding brought by a party hereto in pursuit of its rights or in the exercise of its remedies hereunder, all documents and information concerning the Company and its Subsidiaries furnished to it by the Company or its Representatives in connection with this Agreement or the transactions contemplated hereby, except to the extent that such documents or information can be shown to have been (w) known by SBT, any of its Affiliates or any of their respective Representatives prior to disclosure by the Company or its Representatives, (x) in the public domain (either prior to or after the furnishing of such documents or information hereunder) through no fault of SBT and its Representatives, (y) later acquired by SBT, any of its Affiliates or any of their respective Representatives from another source if SBT, such Affiliate or such Representative is not aware that such source is under an obligation to the Company to keep such documents and information confidential or (z) independently developed by SBT or any of its Affiliates.  In the event that this Agreement is terminated without the transactions contemplated hereby having been consummated, upon the request of the Company, SBT will, and will cause its Representatives to, promptly redeliver or cause to be redelivered all copies of documents and information furnished by the Company or its Representatives to SBT, its Affiliates and their Representatives in connection with this Agreement or the transactions contemplated hereby and destroy or cause to be destroyed all notes, memoranda, summaries, analyses, compilations and other writings related thereto or based thereon prepared by SBT or its Representatives.

- 43 -

Section 5.4.    Meeting of Stockholders.  Notwithstanding the Stockholder Approval described in Section 3.3, the Company shall, if reasonably requested by SBT, (i) duly call, give notice of, convene and hold a meeting of or solicit proxies or written consents from its stockholders for the purpose of voting on the adoption of this Agreement and (ii) take such additional actions as SBT reasonably may request or as may be necessary or appropriate for the consummation of the Merger and the other transactions contemplated by this Agreement and the Escrow Agreement and the fulfillment of the Company's obligations under Section 262 of the DGCL to cause the exercise or waiver by the Company's stockholders of their appraisal rights under Section 262 of the DGCL, whether or not the Board of Directors of the Company modifies or withdraws its approval of this Agreement, its declaration of its advisability or its recommendation that the stockholders adopt it.  The Company shall take these actions as soon as reasonably practicable after any such request by SBT.  The Parties hereby agree that the existence of a substantial likelihood that any Person will have appraisal rights with respect to the Merger following the Effective Time shall be deemed to constitute reasonable grounds for the request by SBT of the taking of any actions described in clauses (i) or (ii) of this Section 5.4.

Section 5.5.    Regulatory and Other Approvals.  Subject to the terms and conditions of this Agreement, each of the Company and SBT will use all commercially reasonable efforts to do, or cause to be done, all things necessary, proper or advisable to, as promptly as practicable, (i) obtain all consents, approvals or actions of, make all filings with and give all notices to governmental or regulatory authorities or any other public or private third parties required of SBT or any of its Subsidiaries or the Company to consummate the Merger and the other matters contemplated hereby, and (ii) provide such other information and communications to such governmental or regulatory authorities as the other party or such governmental or regulatory authorities may reasonably request.  In addition to and not in limitation of the foregoing, each of the parties will (x) take promptly all actions necessary to make the filings required of SBT and the Company or their Affiliates under the HSR Act and under any similar or comparable foreign antitrust statute or regulation, (y) comply at the earliest practicable date with any request for additional information received by such party or its Affiliates from the Federal Trade Commission (the "FTC") or the Antitrust Division of the Department of Justice (the "Antitrust Division") pursuant to the HSR Act or from similar or comparable foreign governmental authorities, and (z) cooperate with the other party in connection with such party's filings under the HSR Act and comparable foreign statutes and in connection with resolving any investigation or other inquiry concerning the Merger or the other matters contemplated by this Agreement commenced by the FTC, the Antitrust Division, or state attorneys general or comparable foreign authorities.  SBT shall pay the filing fees with respect to filings required under the HSR Act.  Notwithstanding the foregoing, neither SBT or any of its Affiliates on the one hand, nor the Company or any of the Stockholders on the other hand, shall be required to defend any lawsuit or other legal proceedings by any Governmental Entity, whether judicial or administrative, challenging this Agreement or the transactions contemplated hereby, or to divest or hold separate or otherwise take or commit to take any action that limits its freedom of action with respect to, or its ability to retain, any of its businesses, assets or product lines or that otherwise could materially adversely affect SBT or its Affiliates.

Section 5.6.    <u>Notice and Cure</u>.  Each party to this Agreement agrees that it shall promptly notify in writing the other party hereto if such notifying party becomes aware of any breach of, or inaccuracy in, or of any facts or circumstances constituting or resulting in the breach of, or inaccuracy in, any representation, warranty or covenant of such notifying party, and such notifying party shall contemporaneously provide the other with true and complete copies of any and all information or documents relating to, and will use commercially reasonable efforts to cure before the Effective Time, any event, transaction or circumstance occurring after the date of this Agreement that causes or will cause any such covenant or agreement under this Agreement to be breached or that renders or will render untrue any such representation or warranty contained in this Agreement as if the same were made on or as of the date of such event, transaction or circumstance.  No notice given pursuant to this Section 5.6 shall have any effect on (i) the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining the satisfaction of any condition contained herein or (ii) any right to indemnity hereunder.

Section 5.7.    <u>Company Stock Plan</u>.  The Company shall take or cause to be taken, through its Board of Directors or the appropriate committee thereof, by all steps necessary, if any, to give effect to the provisions of Section 2.1(e).

Section 5.8.    <u>Termination of Contracts</u>.  The Company will obtain all consents and releases required to terminate, as of the Effective Time, the shareholder and other agreements listed in Section 5.8 of the Disclosure Schedule without liability to the Company following the Effective Time, and such consents, releases and terminations remain in full force and effect.

Section 5.9.    <u>Fulfillment of Conditions</u>.  Subject to the terms and conditions of this Agreement, each of SBT and the Company will take or cause to be taken all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy each condition to the other's obligations contained in this Agreement and to consummate and make effective the transactions contemplated by this Agreement, and will not, nor will it permit any of its Subsidiaries to, take or fail to take any action that could be reasonably expected to result in the nonfulfillment of any such condition.  Without limiting the foregoing, the Company and the Stockholders shall deliver the certificates, agreements, instruments and other documents contemplated by Article VI, and such other certificates, instruments or documents, including secretary's certificates, reasonably requested by SBT.

Section 5.10.    <u>Additional Covenants as to Convertible Notes</u>.

(a)    Each of the holders of Convertible Notes agrees that the acceptance by such Person of the number of shares (or in the case of any prepayment of such Convertible Notes, the aggregate amount of principal, interest and premium, if any, due thereon, or a combination of shares and cash payments) set forth opposite such Person's name on Section 3.2 of the Disclosure Schedule, payable at or before the Effective Time shall constitute an acknowledgment that such payment is the full payment of the Company's obligation under the applicable Convertible Note and that the Company and the Surviving Corporation shall be

- 45 -

thereafter be fully and unconditionally released from all obligations under the Convertible Note with no further liability on the part of the Company or the Surviving Corporation.

(b)     Each holder of Convertible Notes agrees that he or she will, at Effective Time, release the Company from any and all claims such Person may have against Acquisition and the Company by the execution and delivery of an instrument of release substantially in the form of Exhibit E hereto.

Section 5.11.    Additional Agreements of Stockholders.

(a)     At every meeting of the stockholders of the Company called with respect to any of the following, and at every postponement or adjournment thereof, and on every action or approval by written consent of the stockholders of the Company with respect to any of the following, each Stockholder agrees that it shall vote all of the Shares that it owns beneficially and of record on the record date of any such vote: (i) in favor of the Merger, the execution and delivery of the Merger Agreement and the approval of the terms thereof and each of the other transactions contemplated by this Agreement and (ii) against the following actions (other than the Merger and the transactions contemplated by this Agreement): (1) any extraordinary corporate transaction, such as a merger, consolidation or other business combination involving the Company; (2) a sale, lease or transfer of a material amount of Assets of the Company or a reorganization, recapitalization, dissolution or liquidation of the Company; (3) (a) any change in the board of directors of the Company; (b) any material change in the present capitalization of the Company or any amendment of the certificate of incorporation or similar governing document of the Company; (c) any other material change in the corporate structure or business of the Company; or (d) any other action, which, in the case of each of the matters referred to in clauses (a), (b), (c) or (d) above, is intended, or could reasonably be expected, to impede, interfere with, delay, postpone or materially adversely affect the contemplated economic benefits to the Surviving Corporation of the Merger or the transactions contemplated by this Agreement.

(b)     Except as disclosed on Section 3.2(a) of the Disclosure Schedule, none of the Stockholders shall, directly or indirectly: (i) except pursuant to the terms of this Agreement offer for sale, sell, transfer, tender, pledge, encumber, assign or otherwise dispose of, or enter into any contract, option or other arrangement or understanding with respect to or consent to the offer for sale, sale, transfer, tender, pledge, encumbrance, assignment or other disposition of, any or all of the Existing Securities or shares of Company Common Stock acquired by such Stockholder prior to the Effective Time; (ii) except as contemplated by this Agreement, grant any proxies or powers of attorney, deposit any such Shares into a voting trust or enter into a voting agreement with respect to any of the Existing Securities or shares of Company Common Stock acquired by such Stockholder prior to the Effective Time; or (iii) take any action that would make any representation or warranty contained herein untrue or incorrect or have the effect of preventing, restricting or disabling such Stockholder from performing its obligations under this Agreement.

(c)     Each of the Stockholders agrees to deliver to SBT at Closing a release in the form of Exhibit E.

(d)    Each of the Stockholders hereby expressly waives his, her or its appraisal rights under Section 262 of the DGCL with respect to the Existing Securities and all shares of Company Common Stock acquired by such Stockholder prior to the Effective Time.

Section 5.12.    _Lessor Letters_.  Upon the execution of this Agreement, the Company and each of the Subsidiaries shall exercise all commercially reasonable efforts to obtain and to deliver to Acquisition and SBT prior to Closing, consents or confirmations of the absence of any default and other items, as indicated on Section 6.1(m) of the Disclosure Schedule (such consents or confirmations not to be conditioned upon any increased rental, other payment, reduced term or other change of lease terms) in a form reasonably acceptable to Acquisition and SBT from the lessor under each of the Leases to the extent requested by Acquisition and SBT (collectively, the "Lessor Letters" ).

Section 5.13.    _Additional Financial Statements_.  Within five (5) business days after such materials become available, the Company shall deliver to SBT a consolidated balance sheet, statement of results of operations and statement of cash flows of the Company and the Subsidiaries taken as a whole for each calendar month and fiscal year-to-date activity (the "Periodic Financial Statements").

Section 5.14.    _Employee Agreements_.  The Company and each of the Subsidiaries shall exercise all commercially reasonable efforts to cause the employees listed in Section 5.14 of the Disclosure Schedule to execute and deliver to SBT at the Closing employee agreements in substantially the form attached hereto as Exhibit F.  SBT agrees to execute and deliver to the employees listed in Section 5.14 of the Disclosure Schedule employee agreements substantially in the form of Exhibit F at the Closing.

## ARTICLE VI  CONDITIONS TO CLOSING.

Section 6.1.    _Conditions to the Obligations of SBT and Acquisition_.  The obligation of SBT and Acquisition to effect the Merger, is subject to the fulfillment on or prior to the Closing Date of each of the following conditions (all or any of which, other than Section 6.1(f), may be waived by SBT in its sole discretion):

(a)    _Performance of Obligations; Representations and Warranties_.  Each of the Company and the Stockholders shall have performed and complied in all material respects with all covenants and agreements contained in this Agreement that are required to be performed or complied with by it prior to or at the Closing Date, and, each of the Company's and each Stockholder's representations and warranties contained in this Agreement shall be true and correct in all material respects (if not qualified by materiality) and in all respects (if qualified by materiality) as of the date hereof and as of the Closing Date as though made on and as of the Closing Date or in the case of representations and warranties made as of a specified date earlier than the Closing Date, shall have been true and correct in all material respects (if not qualified by materiality) and in all respects (if qualified by materiality, other than the covenants contained in Section 5.8, which shall have been performed in all respects) on and as of such date and the

- 47 -

Company shall have delivered to SBT a certificate, dated the Closing Date executed on behalf of the Company by its Chairman, President or a Vice President, to such effect.

        (b)    <u>Employment Agreements</u>.  The key employees of the Company and the Subsidiaries listed in Section 6.1(b) of the Disclosure Schedule shall each have executed and delivered to SBT an employment agreement substantially in the form attached hereto as Exhibit F.

        (c)    <u>Consents</u>.  The Company shall have received or made the consents, approvals, authorizations, permissions, notices and filings listed on Schedule 6.1(c) and all of them shall be in form and substance satisfactory to SBT and Acquisition.

        (d)    <u>Opinion</u>.  SBT and Acquisition shall have received the opinion of Akerman Senterfitt & Eidson, P.A., dated as of the Closing Date, substantially in the form attached hereto as Exhibit G.

        (e)    <u>Escrow Agreement</u>.  The Escrow Agreement shall have been duly executed and delivered by the parties thereto.

        (f)    <u>Antitrust Waiting Periods</u>.  Any waiting period (and any extension thereof) applicable to the consummation of the Merger under the HSR Act shall have expired or been terminated.

        (g)    <u>Material Adverse Effect</u>.  There shall not have occurred and be continuing any event or occurrence, or series of events of occurrences, that individually or in the aggregate would reasonably be expected to have a Material Adverse Effect.

        (h)    <u>Invoices</u>.  The Company shall have delivered to SBT the Invoices (as defined in Section 9.1).

        (i)    <u>Dissenting Shares</u>.  The applicable 20-day period in Section 262(d) of the DGCL for stockholders to demand or perfect dissenters rights pursuant to Section 262 of the DGCL shall have expired and such rights shall not have been exercised with respect to more than 5% of the outstanding shares of any class of capital stock of the Company.

        (j)    <u>Illegality</u>.  There shall not have been issued and be in effect any order, decree or judgment of any court or tribunal of competent jurisdiction which makes the consummation of the Merger illegal.

        (k)    <u>Liens</u>.  (i) Except as set forth in Section 6.1(k)(1) of the Disclosure Schedule, all material Liens on or affecting any assets of the Company or the Subsidiaries shall have been released and terminated, and evidence thereof reasonably satisfactory to SBT shall have been delivered to SBT by the Company; and (ii) the Company shall have delivered or caused to be delivered to SBT "payoff letters" from each of the Persons secured by Liens set forth in Section 6.1(k)(2) of the Disclosure Schedule and from each of the Persons to whom the

Company or any Subsidiary owes any amount that is or should be included in Closing Debt Amount, including a payoff letter from the Agent under the Revolving Credit and Term Loan Agreement, dated as of December 14, 1999, by and among the Company and Security Technologies Group, Inc., as Borrowers, the Lenders party thereto and Citizens Bank of Massachusetts, as Agent, as amended (the "Company's Credit Facility"), each payoff letter indicating the amount required as of the Closing Date to repay in full at the Closing all obligations owed to such Persons and to provide for a release of all Liens on the assets of the Company or any Subsidiary securing such obligations, including the Company's Credit Facility; provided, however, that the release or termination of Liens arising under the Company's Credit Facility or any capital lease obligations shall not be a condition to Closing unless SBT provides funds necessary to repay and cause to be repaid all amounts owing under the Company's Credit Facility or any capital lease obligations pursuant to the applicable payoff letter; provided further, however, that if SBT provides the funds necessary to repay and causes to be repaid all amounts owing under the Company's Credit Facility or any capital lease obligations, such amounts provided by SBT shall still be included in the Closing Debt Amount.

(l)    Release.  Each Stockholder shall have executed a waiver and release substantially in the form attached hereto as Exhibit E releasing SBT, the Surviving Corporation, the Company and the Subsidiaries from all claims of such Stockholder against the Company and the Subsidiaries arising prior to the Effective Time, including, without limitation, any rights of such Stockholder to indemnity from the Surviving Corporation, the Company or any Subsidiary arising from claims asserted by third parties prior to the Effective Time.  Each employee listed in Section 6.1(l) of the Disclosure Schedule, which shall be delivered to SBT by the Stockholders' Representative three business days prior to Closing and which shall identify all employees eligible to participate in the plan described in Section 2.4(d)(ii) of the Disclosure Schedule and shall not identify more than 10 persons, shall have executed a waiver and release in respect of the plan described in Section 2.4(d)(ii) of the Disclosure Schedule releasing SBT, the Surviving Corporation, the Company and the Subsidiaries from all claims arising in respect of such plan.

(m)    Lessor Letters.  Acquisition and SBT shall have received Lessor Letters with respect to the Leases set forth in Section 6.1(m) of the Disclosure Schedule.

(n)    Updated Project Backlog Report.  The Company shall have delivered to SBT the Updated Project Backlog Report if requested by SBT in accordance with Section 3.13, and there shall be no material adverse deviations from the Project Backlog Report reflected in the Updated Project Backlog Report.

(o)    Tax Returns.  The Company shall have filed all federal and state Income Tax Returns of the Company and the Subsidiaries that are required to be filed on or before the Effective Time and shall have paid all federal and state Taxes required to be paid with respect to such Income Tax Returns.

Section 6.2.     <u>Conditions to the Obligations of the Company</u>.  The obligation of the Company to effect the Merger is subject to the fulfillment at or prior to the Closing Date of each of the following conditions (all of which may be waived by the Company in its sole discretion).

(a)     <u>Performance of Obligations; Representations and Warranties</u>.  SBT and Acquisition shall have performed and complied in all material respects with all covenants and agreements contained in this Agreement that are required to be performed or complied with by them prior to or at the Closing Date and each of the representations and warranties of Acquisition and SBT contained in Article IV of this Agreement shall be true and correct, in all material respects (if not qualified by materiality) and in all respects (if qualified by materiality) as of the Closing Date as though made on and as of the Closing Date or, in the case of representations and warranties made as of a specified date earlier than the Closing Date, shall have been true and correct in all material respects (if not qualified by materiality) and in all respects (if qualified by materiality) on and as of such date and each of SBT and Acquisition shall have delivered to the Company a certificate dated the Closing Date executed on behalf of each of them by an authorized signatory to such effect.

(b)     <u>Opinion</u>.  The Company shall have received the opinion of counsel to SBT, dated as of the Closing Date, substantially in the form attached hereto as Exhibit H.

(c)     <u>Escrow Agreement</u>.  The Escrow Agreement shall have been duly executed and delivered by the parties thereto.

(d)     <u>Antitrust Waiting Periods</u>.  Any waiting period (and any extension thereof) applicable to the consummation of the Merger under the HSR Act shall have expired or been terminated.

(e)     <u>Orders; Judgments</u>.  There shall not have been issued and be in effect any order, decree or judgment of any court or tribunal of competent jurisdiction which makes the consummation of the Merger illegal.

## ARTICLE VII  SURVIVAL; INDEMNIFICATION; TAX MATTERS.

Section 7.1.     <u>Survival</u>.  Except as otherwise provided herein, all the representations, warranties, covenants and agreements of the Company contained in or made pursuant to this Agreement shall survive the Closing and shall remain operative and in full force and effect for a period of 18 months after the Effective Time (such period being referred to as the "<u>Survival Period</u>"), regardless of any investigation or statement as to the results thereof made by or on behalf of any Person before or after the Closing, <u>provided</u>, <u>however</u>, that (a) the representations and warranties contained in Sections 3.1, 3.2, 3.3, 3A.1, 3A.2, 4.1 and 4.2 shall survive after the Closing Date in perpetuity; (b) the representations and warranties contained in Sections 3.17, 3.18 and 3.21 shall survive for a period of 36 months after the Effective Time; and (c) claims based on fraud or fraudulent misrepresentations shall survive after the Effective Time in perpetuity. Notwithstanding anything herein to the contrary, any representation, warranty, covenant and agreement which is the subject of a claim which is asserted in writing prior to the

expiration of the Survival Period shall survive with respect to such claim or any dispute with respect thereto until the final resolution thereof.

Section 7.2.     Indemnification.  SBT, its employees, agents, directors, officers, subsidiaries and its Affiliates, including Acquisition and the Surviving Corporation, and the employees, agents, directors, officers and subsidiaries of its Affiliates (the "Indemnified Parties") shall be indemnified and held harmless by the Company (prior to the Effective Time only), the holders of Company Common Stock, the Convertible Notes and the Options, including the Stockholders from and against any and all damages, claims, losses, expenses, costs, obligations and liabilities, including without limitation liabilities for all reasonable attorneys', accountants', and experts' fees and expenses including those incurred to enforce the terms of this Agreement or the Escrow Agreement (collectively, "Losses") asserted against, or paid, suffered or incurred by any Indemnified Party which, directly or indirectly, arise out of, result from, are based upon or relate to: (i) (x) the inaccuracy, untruth or incompleteness, as of the date of this Agreement or the Closing Date (or, in the case of representations and warranties made as of a specified date earlier than the Closing Date, on and as of such earlier date), of any representation or warranty made or deemed to have been made by the Company or a Stockholder in this Agreement or (y) any failure by the Company to perform or fulfill any of its covenants or agreements set forth in this Agreement which are required to be performed or fulfilled at or prior to the Effective Time and any failure by any Stockholder or the Stockholders' Representative to perform or fulfill any of its covenants or agreements set forth in this Agreement (including without limitation the obligations set forth in Section 2.2); (ii) any claim, action, suit or proceeding brought against the Company or any Subsidiary by any Stockholder arising out of or relating to events or circumstances occurring or existing prior to the Effective Time; (iii) any severance obligation paid or payable to, and any claim, action, suit or proceeding brought by George R. Horn, Douglas Garton or James Madson in respect of the severance obligations of George R. Horn, Douglas Garton and James Madson listed in Section 3.12(a)(x) of the Disclosure Schedule, and any claim, action, suit or proceeding brought by any Person in respect of agreements required to be disclosed but not disclosed in Section 3.12(a)(x) of the Disclosure Schedule; (iv) any fees or out-of-pocket expenses of the Company (other than fees and expenses incurred by the Company after the Effective Time at the direction of SBT) or the Stockholders incurred in connection with this Agreement and the Merger to the extent not taken into account in the Closing Debt Amount or the Closing Date Working Capital or paid out of the Stockholders' Representative Expense Amount; (v) any losses created by any by-law, certificate of incorporation provision or agreement relating to the indemnification of any person who was an officer or director of the Company or any Subsidiary prior to the Effective Date; (vi) any Losses arising out of or related to the matters described in Section 2.4(d)(ii); (vii) any Losses arising out of the litigation disclosed in Section 3.14 of the Disclosure Schedule to the extent such Losses in the aggregate exceed $150,000; (viii) all Taxes of the Company or any Subsidiary attributable to any taxable period (or portion thereof) ending on or before the Effective Time, regardless of when such Taxes are due or payable; (ix) any Losses arising out of or related to the failure of the Company or any Subsidiary to be in good standing in Kansas, Virginia or Oklahoma, to the extent that such Losses exceed $5,000 in the aggregate; (x) any Losses arising out of or related to the failure of the Company or any Subsidiary to file the Form 5500 listed in Section 3.18 of the Disclosure

Schedule, to the extent such Losses exceed $30,000 in the aggregate; or (xi) any Losses arising out of or related to the matter listed in Section 3.16(a) of the Disclosure Schedule, to the extent such Losses exceed $300,000 in the aggregate. It is understood by the parties to this Agreement that notwithstanding that the Company is making certain representations, warranties, covenants and agreements under this Agreement, the Stockholders shall be fully responsible for the Company's breach of any such representations, warranties, covenants and agreements pursuant to this Article VII and, if the Merger is consummated, the Stockholders shall have no right of contribution against the Company, the Surviving Corporation or any of the Subsidiaries in respect of any of the Stockholders' indemnification obligations hereunder.

Section 7.3.    <u>Limitation of Liability; Disposition of Escrow Fund</u>.

(a)    After the Closing, the Indemnified Parties' rights to indemnification under Section 7.2 shall be subject to the following limitations: (i) in no event shall the aggregate amount to be paid to the Indemnified Parties (x) under Section 7.2 (i)(x) (other than the representations and warranties contained in Sections 3.1, 3.2, 3.3, 3.17, 3.25, 3A.1 and 3A.2 (the "<u>Specified Representations</u>"), which breaches of the Specified Representations shall not be subject to the limitations in this Section 7.3(a)(i)), (y) under Section 7.2(i)(y) if such amount is required to be paid under Section 7.2(i)(y) solely in respect of a breach of the covenants contained in this Agreement, other than the covenants set forth in Article II hereof and other than an intentional or fraudulent breach of any covenants, which intentional or fraudulent breaches shall not be subject to the limitations in this Section 7.3(a)(i)), or (z) under Sections 7.2(vii), 7.2(viii), 7.2(ix), 7.2(x) or 7.2(xi) exceed FIFTEEN MILLION DOLLARS ($15,000,000); (ii) the Indemnified Parties shall be entitled to recover any Loss otherwise recoverable pursuant to (x) Section 7.2(i)(x) (other than the Specified Representations, which breaches shall not be subject to the limitations in this Section 7.3(a)(ii)) or (y) under Section 7.2(i)(y) if such amount is required to be paid under Section 7.2(i)(y) solely in respect of a breach of the covenants set forth in Sections 5.1(a), 5.1(b)(1) or 5.1(b)(2)(xiii) (the "<u>Specified Covenants</u>") (other than an intentional or fraudulent breach of the Specified Covenants, which intentional or fraudulent breaches shall not be subject to the limitations in this Section 7.3(a)(ii) only to the extent the aggregate of Losses otherwise recoverable pursuant such Sections exceeds FIVE HUNDRED THOUSAND DOLLARS ($500,000).

(b)    The Escrow Fund shall be security for the Indemnified Parties' rights to indemnification hereunder and shall be the sole and exclusive remedy of the Indemnified Parties with respect to indemnification from the Employee Optionholders under this Article VII. If any amounts are distributed to the Indemnified Parties from the Escrow Fund as indemnification for Losses, each Stockholder and each Employee Optionholder shall be deemed to have satisfied such Stockholder's or Employee Optionholder's indemnification obligations to the extent of such Stockholder's or Employee Optionholder's proportionate share of the amounts so distributed, determined in accordance with the Escrow Agreement. Each Stockholder's indemnification obligations with respect to Losses otherwise recoverable pursuant to Section 7.2 shall not exceed the amount determined by multiplying the aggregate amount of such Losses by a fraction, the numerator of which is the total number of shares of Company Common Stock held

by such Stockholder immediately prior to the Effective Time (assuming the exercise or conversion of all Options and Convertible Notes held by such Stockholder) and the denominator of which is the total number of shares of Company Common Stock held by all Stockholders immediately prior to the Effective Time (assuming the exercise or conversion of all Options and Convertible Notes held by all Stockholders).

Section 7.4.   Stockholders' Representative.   (a) The Company hereby appoints, and the Company's stockholders (including the holders of Convertible Notes and the Options and the Stockholders) shall be deemed to (i) appoint, the Stockholders' Representative, with full and unqualified power to delegate to one or more Persons the authority granted to him hereunder, to act as each of their agent and attorney-in-fact, with full power of substitution, to take all actions called for by this Article VII and the Escrow Agreement, on their individual and collective behalf, in accordance with the terms of this Article VII and the Escrow Agreement; (ii) waive any claim it may have against SBT, Acquisition, the Company, the Surviving Corporation or any of their respective Subsidiaries or the Indemnified Parties of each of them with respect to the Stockholders' Representative Expense Amount (once such amount is delivered to the Stockholders' Representative), any distributions of the Stockholders' Representative Expense Amount and the conduct of, and actions taken or not taken by, the Stockholders' Representative hereunder; and (iii) agree that SBT, Acquisition, the Company, the Surviving Corporation and their respective Subsidiaries and the Indemnified Parties of each of them shall have no liability to any Person therefor.

(b)     In the event of the death or permanent disability of the Stockholders' Representative, or his resignation, a successor Stockholders' Representative shall be appointed by a majority vote of the holders (other than SBT and its subsidiaries) of outstanding capital stock of the Company immediately prior to the Effective Time, with each such stockholder (or his or her successors or assigns) to be given a vote equal to the number of votes represented by the shares of capital stock of the Company held by such stockholder immediately prior to the Effective Time.

Section 7.5.   Notice of Claims.   If any of the Indemnified Parties believes that it has suffered or incurred any Loss, it shall notify the Escrow Agent (if during the Escrow Period and if funds remain in the Escrow Fund) and the Stockholders' Representative promptly in writing (at their respective addresses set forth in the Escrow Agreement), and in any event within the applicable time period specified in Section 7.1, describing such Loss, all with reasonable particularity and containing a reference to the provisions of this Agreement in respect of which such Loss shall have occurred (a "Claim Notice"). If any legal action is instituted by a third party with respect to which any of the Indemnified Parties intend to claim indemnity under this Section 7.5, such Indemnified Party shall promptly give a Claim Notice to notify the Escrow Agent and the Stockholders' Representative with respect to such legal action. In any event, a failure or delay in notifying the Escrow Agent and the Stockholders' Representative shall not affect the Indemnified Party's right to indemnity, except only to the extent such failure or delay materially and adversely prejudices the ability to defend against any legal action.

Section 7.6.    <u>Defense of Third Party Claims</u>.    Subject to the Stockholders' Representative's right to assume the defense of third party claims described herein, the Indemnified Parties shall have the right to conduct and control, through counsel of their own choosing, reasonably acceptable to the Stockholders' Representative, any third party legal action or other claim, but the Stockholders' Representative may, at his election, participate in (but not control) the defense thereof at his sole cost and expense; provided, however, that if the Indemnified Parties shall fail to defend any such legal action or other claim, then the Stockholders' Representative may defend, through counsel of his own choosing, such legal action or other claim, and so long as it gives SBT at least 15 days' notice of the terms of the proposed settlement thereof and permits SBT to then undertake the defense thereof, except as set forth below, settle such legal action or other claim.    The Stockholders' Representative shall have 10 days after the receipt of a Claim Notice in respect of a third party claim to notify the Indemnified Parties in writing that the Stockholders' Representative has elected to assume the defense of such third party claim; provided, that, with respect to the claims listed in Section 3.14(a) of the Disclosure Schedule, the Stockholders' Representative may elect (by notifying the Indemnified Parties in writing) to assume the defense of such claims within 10 days of the date hereof if he otherwise would be permitted to assume such defense pursuant to the penultimate sentence of this Section 7.6.    If the Stockholders' Representative elects to assume the defense of any third party claim, the Stockholders' Representative shall be entitled, at his own cost and expense, to conduct and control the defense and settlement of such third party claim with counsel of his choosing; provided that the Indemnified Parties may participate in (but not control) the defense of such third party claim at their own expense.    Notwithstanding the foregoing, the Stockholders' Representative shall not be entitled to assume the defense of any third party claim unless: (i) the claim involves solely monetary damages and shall not be likely in the Indemnified Parties' reasonable judgment to have a material adverse effect on any of the Indemnified Parties or, in any of the Indemnified Parties' good faith judgment, to have a detrimental effect on the business prospects of such Indemnified Party; (ii) the third party claim does not arise from the same events, facts or circumstances as, and is not otherwise substantially similar in nature to, other third party claims asserted or threatened; (iii) the Stockholders' Representative shall have agreed in writing that, as between the Stockholders' Representative and the Indemnified Parties, the Stockholders' Representative shall be solely obligated to satisfy and discharge such claim; and (iv) if requested by the Indemnified Parties, the Stockholders' Representative shall have made adequate provision to ensure the Indemnified Parties of the Stockholders' Representative's financial ability to satisfy the full amount of any adverse monetary judgment that may result from such third party claim.    Neither SBT nor the Stockholders' Representative shall compromise or settle any such legal action or other claim without the prior written consent of the other, which consent shall not be unreasonably withheld, except that under no circumstances shall SBT be required to consent to the entry of an order for injunctive or other non-monetary relief.

Section 7.7.    <u>Dispute Resolution: Negotiation, Mediation and Arbitration</u>.

(a)    The Parties shall attempt to resolve any dispute arising out of or relating to this Agreement promptly by negotiation in good faith between executives who have

- 54 -

authority to settle the dispute. Any Party shall give any other Party written notice of any dispute not resolved in the ordinary course of business. Within seven days after delivery of such notice, the Party receiving notice shall submit to the other a written response thereto. The notice and the response shall include: (i) a statement of each Party's position(s) regarding the matter(s) in dispute and a summary of arguments in support thereof, and (ii) the name and title of the executive who will represent that Party and any other Person who will accompany that executive.

(b)    All reasonable requests for information made by one Party to any other shall be honored in a timely fashion. All negotiations conducted pursuant to this Section 7.7 (and any of the Parties' submissions in contemplation hereof) shall be kept confidential by the Parties and shall be treated by the Parties and their representatives as compromise and settlement negotiations under the Federal Rules of Evidence and any similar state rules.

(c)    If the matter in dispute has not been resolved within 30 days after the selection of the mediator, either Party (the "Claimant") may submit the dispute to binding arbitration to the New York, New York office of the American Arbitration Association ("AAA") in accordance with the procedures set forth in the Commercial Arbitration Rules of the AAA, revised and effective July 1, 1996.

(d)    The Commercial Arbitration Rules of the AAA, revised and effective July 1, 1996, as modified or revised by the provisions of this Section 7.7, shall govern any arbitration proceeding hereunder. The arbitration shall be conducted by three arbitrators selected pursuant to Rule 13 of the Commercial Arbitration Rules, and pre-hearing discovery shall be permitted if and only to the extent determined by the arbitrator to be necessary in order to effectuate resolution of the matter in dispute. The arbitrator's decision shall be rendered within 30 days of the conclusion of any hearing hereunder and the arbitrator's judgment and award may be entered and enforced in any court of competent jurisdiction.

(e)    Resolution of disputes under the procedures of this Section 7.7 shall, subject to Section 7.8, be the sole and exclusive means of resolving disputes arising out of or relating to this Agreement; provided, however, that nothing herein shall preclude the Parties from seeking in any court of competent jurisdiction temporary or interim injunctive relief to the extent necessary to preserve the subject matter of the dispute pending resolution under this Section 7.7.

Section 7.8.    Exclusive Remedy. Except for (i) fraud and knowing misrepresentations, and (ii) the Parties' right hereunder to injunctive or other equitable relief to enforce their rights under this Agreement, (a) the remedies set forth in Article VII hereof constitute SBT's sole and exclusive remedy for breaches of the representations, warranties, covenants and agreements contained in this Agreement and (b) the provisions of Section 7.7 shall be the exclusive dispute resolution procedure with respect to any disputes arising out of or relating to this Agreement as provided in Section 7.7(e). In no event shall the Surviving Corporation have any obligation with respect to any breach of the representations, warranties, covenants and agreements contained in Article III, Article IIIA or Article V hereof or any other covenant or agreement of the Company which is to be performed by the Company prior to the Effective Time.

- 55 -

Section 7.9.  <u>Tax Matters</u>.  The Company shall cause to be prepared and filed prior to the Effective Time all federal and state Income Tax Returns of the Company and the Subsidiaries that are required to be filed on or before the Effective Time and shall pay, prior to the Effective Time, all federal and state Taxes required to be paid with respect to such Tax Returns.  Such Tax returns shall be prepared in accordance with all applicable laws and shall accurately reflect the taxable income and operations of the Company and the Subsidiaries for all taxable periods covered by such Tax Returns.  The Company shall deliver to SBT, at least 15 days prior to the Effective Time, draft copies of all such Tax Returns that are required to be prepared and filed pursuant to this Section 7.9 for SBT's review and consent, which consent shall not be unreasonably withheld.  The Company and the Subsidiaries shall provide SBT with reasonable cooperation with respect to its review of the Tax Returns.  Without the prior consent of the Stockholders' Representative, which shall not be unreasonably withheld, Siemens shall not amend any Tax Returns of the Company for periods ending on or prior to the Effective Time if such amendments will adversely affect the Stockholders under this Agreement or otherwise.

ARTICLE VIII    TERMINATION; EFFECT OF TERMINATION.

Section 8.1.  <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing Date, and the transactions contemplated hereby may be abandoned:

(a)  by mutual written agreement of the Company, Acquisition, SBT and the Stockholders' Representative;

(b)  by either the Company or SBT upon notification to the non-terminating party by the terminating party:

(i)  at any time after August 6, 2001 (the "<u>Upset Date</u>") if the Merger shall not have been consummated on or prior to such date and such failure to consummate the Merger is not caused by a breach of this Agreement by the terminating party; <u>provided, however</u>, that SBT on the one hand, or the Company and the Stockholders' Representative on the other hand, may, at its or their option, extend the Upset Date for a period not to exceed 60 days by written notice to the Company and the Stockholders' Representative or to SBT, as applicable, if the failure to consummate the Merger prior to August 6, 2001 is due solely to the failure of the conditions contained in Sections 6.1(f) and 6.2(d) to have been satisfied;

(ii)  that there has been a material breach of this Agreement on the part of the non-terminating party and either (x) the non-terminating party fails to cure such breach within 10 days following notification thereof by the terminating party or (y) the breach is not reasonably capable of being cured within 10 days after notice thereof.

Section 8.2.  <u>Effect of Termination</u>.

Except for any willful breach of this Agreement by any party hereto (which breach and liability therefor shall not be affected by the termination of this Agreement), if this

- 56 -

Agreement is terminated pursuant to Section 8.1 hereof, then this Agreement shall become void and of no effect with no liability on the part of any party hereto (or any of their respective Representatives or Affiliates), except that the provisions of Sections 5.3(b), 9.1, 9.2, 11.1, 11.2, 11.3, 11.4, 11.5, 11.6, 11.7, 11.8, 11.10, 11.12 and 11.14 will continue to apply following any such termination.

## ARTICLE IX FEES AND EXPENSES.

Section 9.1.    _Expenses_.  Subject to Sections 5.5 and 9.2, each party hereto shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby.  In addition, the fees and expenses of all brokers, investment bankers, financial advisors, attorneys and accountants engaged in connection with the preparation and negotiation of this Agreement or the transactions contemplated hereby and whose compensation is payable by the Company shall be reflected on invoices (the "Invoices") submitted to SBT and the Stockholders' Representative on or prior to the Closing Date, which Invoices shall include confirmation that no further compensation or payment beyond the amount reflected in the Invoice is or will be payable by the Company (or the Surviving Corporation, as successor to the Company) and which amounts shall be used to determine the Closing Date Working Capital and/or the Stockholders' Representative Expense Amount; _provided_ that the Company may, in lieu of an Invoice, deliver a written agreement of (i) the Person to whom such compensation is payable releasing the Company, the Surviving Corporation, Acquisition and SBT from any obligation to pay such compensation or make any other payment and (ii) the Stockholder's Representative to make such payments, in each case in a form reasonably satisfactory to SBT (it being understood, to the extent such amounts are paid by the Stockholders' Representative to such Person, such amounts shall not be included in the Closing Date Working Capital in order to avoid double counting).

Section 9.2.    _Stockholders of the Company_.  In no event shall SBT, Acquisition or the Company be liable (before or after the Closing) for any fees and expenses of the stockholders of the Company relating to the transactions contemplated by this Agreement, including, without limitation, legal, accounting and financial advisory fees.

## ARTICLE X  DEFINITIONS.

Section 10.1.    _Table of Definitions_.  As used in this Agreement the terms set forth below shall have the following meanings:

"Affiliate" of a Person shall mean any other Person who directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with, such first Person.

"Audited Financial Statements" shall have the meaning ascribed to such term in Section 3.7.

- 57 -

"Benefit Plan" shall mean any bonus, pension, profit sharing, deferred compensation, written incentive compensation, stock ownership, stock purchase, stock option, phantom stock, retirement, vacation, severance, disability, death benefit, hospitalization, medical or other plan or arrangement providing benefits to any current or former employee, officer, consultant or director of the Company or any Subsidiary.

"Certificate" shall mean a certificate that immediately prior to the Effective Time represents outstanding shares of Company Common Stock.

"Closing Date Working Capital" shall mean the amount, computed as of the Effective Time and in accordance with GAAP applied on a basis consistent with past practice and the methods used in the preparation of the financial statements of the Company at or for the period ended March 31, 2001, equal to the Company's current assets (net of reserves) minus all of its current liabilities (which shall include the categories of assets and liabilities specified in Exhibit D, excluding intercompany receivables, intercompany payables and any amounts included in the Closing Debt Amount and the Stockholders' Representative Expense Amount.

"Closing Debt Amount" shall mean (i) the aggregate amount outstanding of debt for money borrowed by the Company and its Subsidiaries as of the Effective Time, including any principal, interest, prepayment or make-whole amounts or premiums, if any, which would be payable if such debt were paid in full at the Closing, and any other breakage, termination or accelerated payments that would be incurred in connection with terminating any agreement of the Company or any Subsidiary principally related to the foregoing, including any amounts paid by SBT in respect of the Company's Credit Facility or any other obligation of the Company or a Subsidiary including pursuant to Section 2.5; and (ii) all obligations as lessee of the Company and any Subsidiary required to be paid by the Company or any Subsidiary to terminate as of the Effective Time any lease that has been or should be recorded as a capital lease under GAAP. For illustrative purposes only and not as a limitation on the foregoing the Parties agree that all obligations as the date hereof that would be included in the Closing Debt Amount are listed on Schedule 1 hereto.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral Document" shall mean the Disclosure Schedule or any Exhibit to this Agreement and certificate or schedule delivered by a Person or any of its respective directors, officers, employees or trustees pursuant to this Agreement or any Exhibit hereto.

"Control" shall mean the possession of the power, directly or indirectly, to direct or cause the direction of the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise.

"Convertible Notes" shall mean the Convertible Subordinated Notes, each dated October 5, 1998, as amended on October 31, 2000, executed by the Company in favor of the Persons listed in Section 3.2 of the Disclosure Schedule.

- 58 -

"Employee Optionholder" shall mean any holder of record of an Option Agreement who is not a Stockholder, it being understood that all such holders are employees of the Company or a Subsidiary but that any employee who holds any securities or capital stock of the Company other than Options is a Stockholder.

"Environmental Claim" shall mean any written claim, action, investigation or notice by any Person alleging potential liability arising out of, based on, or resulting from (a) the presence or release into the environment, including, without limitation, the indoor environment, of any Hazardous Substance at any location, whether or not owned by the Company or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"Environmental Laws" shall mean all applicable federal, state, local or foreign laws, statutes, rules and regulations, orders, decrees, judgments, arbitration awards, agreements and permits relating to protection and clean-up of the environment and protection of human health (including those relating solely to occupational health and safety), including those relating to the generation, handling, disposal, transportation or release of Hazardous Substances.

"Escrow Agent" shall mean a bank or trust company designated as the escrow agent by SBT and reasonably satisfactory to the Company.

"Escrow Agreement" shall mean an agreement substantially in the form of Exhibit I, executed and delivered at the Closing.

"Escrow Period" shall mean the period beginning on the Closing Date and ending on the first date on which funds held in the escrow created pursuant to the Escrow Agreement are permitted to be released to the stockholders of the Company under the terms of the Escrow Agreement.

"Governmental Entity" shall mean any: (i) federal, state, local, foreign or international government; (ii) court, arbitrator or other tribunal or governmental or quasi-governmental authority of any nature (including any governmental agency, political subdivisions, instrumentalities, branch, department, official, or entity); or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature pertaining to government.

"Hazardous Substances" shall mean any and all hazardous and toxic substances, wastes or materials, any pollutants, contaminants, or dangerous materials (including, but not limited to, polychlorinated biphenyls, friable asbestos, volatile and semi-volatile organic compounds, oil, petroleum products and fractions, radioactive materials and any materials which include hazardous constituents or become hazardous, toxic, or dangerous when their composition or state is changed), or any other similar substances or materials regulated under Environmental Laws.

"Income Taxes" shall mean Federal income taxes and all state, local and municipal Taxes imposed on or measured by net income, or income, franchise or similar taxes based on gross receipts.

"Income Tax Return" shall mean any Tax Return filed in respect of Income Taxes.

"Knowledge of the Company" and correlative terms shall mean the actual knowledge after due inquiry of the persons listed in Schedule 2 with respect to the representations, warranties and covenants contained in Sections of this Agreement as so indicated with respect to each such person and Section in Schedule 2.

"Letter of Transmittal" shall mean a letter of transmittal sent to the holders of Company Common Stock and Options immediately prior to the Effective Time and which shall specify that delivery shall be effected, and risk of loss and title to the Certificates or Option Agreements, as the case may be, shall pass, only upon delivery of the Certificates or Option Agreements, as the case may be, to SBT and shall be in such form and have such other provisions as the Surviving Corporation may reasonably specify. The Letter of Transmittal shall specify instructions for use in effecting the surrender of the Certificates or Option Agreements, as the case may be, in exchange for the Merger Price or Cash Payments.

"Lien" shall mean any mortgage, pledge, lien, lease, sublease, security interest, conditional or installment sale agreement, encumbrance, charge or other claims of third parties of any kind, except for (a) liens for Taxes or governmental charges or claims (i) not yet due and payable or (ii) being contested in good faith and by appropriate proceedings (with no risk of forfeiture), if a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor on the Interim Financial Statements; (b) statutory liens of landlords, liens of carriers, warehousemen's, mechanics and materialmen's and other liens imposed by law incurred in the ordinary course of business for sums (i) not yet due and payable or (ii) being contested in good faith, if a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor on the Interim Financial Statements; (c) liens incurred or deposits made in connection with workers' compensation, unemployment insurance and other similar types of social security programs in each case in the ordinary course of business consistent with past practice; (d) easements, rights-of-way, restrictions and other similar non-monetary charges or encumbrances, in each case, which do not interfere with the ordinary conduct of the Company's operations and do not or would not materially detract from the value of the property to which such encumbrance relates; and (e) with respect to the Leased Property only, liens, security interests or encumbrances that have been placed by any developer, landlord or other third party on the fee estate in real property with respect to which the Company and the applicable Subsidiary has easement rights or leasehold interests the foreclosure or other exercise of remedies under which liens, security interests or encumbrances at a time when the Company or any applicable Subsidiary is not in default under any applicable grace or cure period under the applicable lease or sublease would not result in a termination of such lease or sublease or of the Company's or such Subsidiaries rights and estates thereunder in and to such Property.

"Material Adverse Effect" shall mean any circumstance or event which, individually or in the aggregate with any other circumstance or event is reasonably likely to be material and adverse to (i) the assets, properties, business, prospects, earnings, condition (financial or otherwise), results of operations or liabilities of the Company and its Subsidiaries taken as a whole, or (ii) the ability of the Company or the Stockholders to perform their respective obligations or to consummate the transactions contemplated by this Agreement and the Escrow Agreement; provided however that any change in general economic conditions which does not have a disproportionate impact on the Company and its Subsidiaries shall not be deemed to be a Material Adverse Effect.

"Option Agreement" shall mean an agreement representing outstanding Options for which a Cash Payment is to be made pursuant to Section 2.1(e).

"Party" shall mean SBT, Acquisition, the Company and its Subsidiaries, the Stockholders and the Stockholders' Representative.

"Person" shall mean any individual, corporation, partnership, limited partnership, limited liability company, other business organization, trust, association or entity or government agency or authority.

"Remaining Escrow Balance" shall mean the amount of funds available pursuant to the Escrow Agreement to be released after payment of all sums due SBT, the Stockholders' Representative and the Escrow Agent, at the end of the Escrow Period.

"Subsidiary" shall mean any corporation, partnership, joint venture or other entity in which the Company (a) owns, directly or indirectly, 50% or more of the outstanding voting securities or equity interests or (b) is a general partner with 50% or more of the voting partnership interests.

"Tax" (and, with correlative meaning, "Taxes" and "Taxable") shall mean any and all taxes, fees, levies, duties, tariffs, imposts, and other charges in the nature thereof (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any government or taxing authority, including, without limitation: taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, or net worth; taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value added, or gains taxes; license, registration and documentation fees; and customs duties, tariffs, and similar charges.

"Tax Return" shall mean any return, report or similar statement required to be filed with respect to any Tax (including any attached schedules), including, without limitation, any information return, claim for refund, amended return or declaration of estimated Tax and all federal, state, local and foreign returns, reports and similar statements.

"<u>Working Capital Amount</u>" shall mean $18,000,000 (EIGHTEEN MILLION DOLLARS).

Each term listed in the table below has the meaning ascribed to such term in the section of this Agreement listed opposite such term.

| Term | Section |
|---|---|
| AAA | 7.7(d) |
| Acquisition | Preamble |
| Acquisition Common Stock | 2.1(a) |
| Acquisition Price | 2.1(c) |
| Adjusted Acquisition Price | 2.1(c) |
| Agreement | Preamble |
| Antitrust Division | 45 |
| Authorizations | 3.15(b) |
| Cash Payment | 6 |
| Certificate of Merger | 1.2 |
| Claim Notice | 7.5 |
| Claimant | 7.7(c) |
| Closing | 1.3 |
| Closing Date | 1.3 |
| Closing Statement | 2.2(b) |
| Commonly Controlled Entity | 3.18(a) |
| Company | Preamble |
| Company Common Stock | Recital |
| Company Stock Plan | 2.1(e) |
| Company's Credit Facility | 6.1(k) |
| DGCL | Recital |
| Disclosure Schedule | Preamble to Article III |
| Dissenting Shares | 2.1(d) |
| Effective Time | 1.2 |
| Employees | 3.19 |
| ERISA | 3.18(a) |
| Escrow Amount | 2.1(c) |
| Estimated Closing Date Working Capital | 2.2(a) |
| Existing Securities | 3.2(c) |
| Financial Statements | 3.7 |
| FTC | 5.4 |
| Fully Diluted Share Amount | 2.1(c) |
| GAAP | 3.7 |
| HSR Act | 3.4(b) |
| Indemnified Parties | 7.2 |
| Independent Accountant | 2.2(d) |
| Initial Closing Statement | 2.2 (a) |

Initial Payment ................................................................................. 2.4(b)
Initial Working Capital Adjustment ..................................................... 4
Interim Financial Statements ............................................................. 3.7
IRS ................................................................................................. 3.17(b)
Laws ............................................................................................... 3.15(a)
Lease .............................................................................................. 3.10(d)
Leased Real Property ...................................................................... 3.10(d)
Lessor Letters ................................................................................. 3.10(d)
Losses ............................................................................................. 5.12
Merger ............................................................................................. 7.2
Merger Price .................................................................................... Recital
New York Courts ............................................................................. 2.1(c)
Notice of Disagreement .................................................................... 11.7
Open Job ......................................................................................... 2.2(d)
Option ............................................................................................. 3.13
Owned Software ............................................................................... 2.1(e)
Pension Plans ................................................................................. 3.17 (f)
Periodic Financial Statements .......................................................... 3.18(a)
Plans ............................................................................................... 5.14
Post-Closing Adjustment Amount ..................................................... 3.18(a)
Potential Acquiror ........................................................................... 2.2(e)
Product Liability Claim .................................................................... 5.2
Product Recall ................................................................................. 3.29
Project Backlog Report .................................................................... 3.29
Representative ................................................................................. 3.13
SBT ................................................................................................. 5.2
Secretary of State ............................................................................ Preamble
Share ............................................................................................... 1.2
Significant Customer ........................................................................ 2.1(c)
Significant Supplier ......................................................................... Section 3.26
Stockholder Approval ...................................................................... Section 3.26(b)
Stockholder Securities ...................................................................... 3.3
Stockholders .................................................................................... 3A.1
Stockholders' Representative ............................................................ Preamble
Stockholders' Representative Expense Amount ................................... 2.2 (a)
Survival Period ................................................................................ 2.1(c)
Surviving Corporation ...................................................................... 7.1
Surviving Corporation Common Stock .............................................. 1.1
Updated Project Backlog Report ....................................................... 2.1(a)
Upset Date ....................................................................................... 3.13
Welfare Plans ................................................................................... 8.1(b)
.......................................................................................................... 3.18(a)

Section 10.2.  <u>Other Terms</u>.  Other terms may be defined elsewhere in the text of this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.

Section 10.3.  <u>Other Definitional Provisions</u>.

(a)     The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Whenever the words "include," "includes" or "including" (or any variation thereof) are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa.

<center>ARTICLE XI  MISCELLANEOUS.</center>

Section 11.1.  <u>Press Releases</u>.  Except as required by law, none of SBT, Acquisition or the Company shall issue any press release or otherwise make public any information with respect to the subject matter of this Agreement nor the transactions contemplated hereby, without the prior written consent of each of the other parties to this Agreement, other than the Stockholders.

Section 11.2.  <u>Integration</u>.  This Agreement and the Collateral Documents set forth the entire understanding of the parties hereto with respect to the transactions contemplated hereby, and, except as set forth in this Agreement, there are no representations or warranties, express or implied, made by any party to this Agreement (or any of their Affiliates) with respect to the subject matter of this Agreement.  Any and all previous agreements and understandings between or among the parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement and the agreements referred to or contemplated herein.  The parties acknowledge that all parties participated in the drafting of this Agreement and the Collateral Documents and agree that any rule of law or any legal decision that may or would require interpretation of any alleged ambiguities in this Agreement or the Collateral Documents against the party that drafted it has no application and is expressly waived.  In the event of a conflict or inconsistency between the terms of this Agreement (including the representations, warranties, covenants and indemnification provisions hereof) and the terms of any other documents delivered or required to be delivered in connection with the consummation of the transactions contemplated by this Agreement, the parties acknowledge and agree that the terms of this Agreement shall supersede such conflicting or inconsistent terms in such other documents and the terms of this Agreement shall define the rights and obligations of the parties and their respective officers, directors, employees, stockholders and Affiliates with respect to the subject matter of such conflict or inconsistency.  In the event of a conflict or inconsistency between any representation, warranty or covenant contained herein, each such representation, warranty or covenant shall be read independently and not as a limitation or expansion of such other representation, warranty or covenant.

Section 11.3.  <u>Assignment and Binding Effect</u>.  This Agreement may not be assigned by either party hereto without the prior written consent of the other party; <u>provided</u>, <u>however</u>, that

<center>- 64 -</center>

Acquisition may assign its rights and obligations under this Agreement, in whole or in part, to any directly or indirectly wholly owned subsidiary of SBT's ultimate parent company, Siemens Aktiengesellschaft, upon written notice to the Company, if the assignee shall assume the obligations hereunder. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto.

Section 11.4. <u>Waiver</u>. Any term or provision of this Agreement may be waived at any time by the party entitled to the benefit thereof only by a written instrument duly executed by such party. In the event such waiver is requested or to be made on behalf of the Stockholders, such waiver must be approved by the Stockholders' Representative.

Section 11.5. <u>Notices</u>. Any notice, request, demand, waiver, consent, approval, or other communication which is required or permitted to be given to any party hereunder shall be in writing and shall be deemed given only if delivered to the party personally or sent to the party by facsimile transmission (promptly followed by a hard-copy delivered in accordance with this Section 11.5), by reputable overnight courier service or by registered or certified mail (return receipt requested), with postage and registration or certification fees thereon prepaid, addressed to the party at its address set forth below:

If to SBT or Acquisition:

Siemens Building Technologies, Inc.
1000 Deerfield Parkway
Buffalo Grove, Illinois 60089
Facsimile: (847) 419-6810
Attention: General Counsel

with copies to:

Siemens Corporation
153 East 53rd Street
New York, New York 10022
Facsimile: (212) 258-4945
Attention: General Counsel

and to:

Dechert
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, Pennsylvania 19103
Facsimile: (215) 994-2222
Attention: William G. Lawlor
Peter D. Cripps

If to the Company:

    Security Technologies Group
    1601 Corporate Sawgrass Parkway, Suite 400
    Sunrise, Florida 33323
    Facsimile: (954) 846-7003
    Attention: Mark Landis

with a copy to:

    Akerman Senterfitt & Eidson, P.A.
    One South East Third Avenue, 27th Floor
    Miami, Florida 33131
    Facsimile: (305) 375-5095
    Attention: Stephen Roddenberry

If to the Stockholders' Representative:

    Steven Sharpe
    134 Lyndhurst Avenue
    Toronto, Ontario
    Canada M5R 2Z9
    Facsimile: (416) 962-0348

with a copy to:

    Akerman Senterfitt & Eidson, P.A.
    One South East Third Avenue, 27th Floor
    Miami, Florida 33131
    Facsimile: (305) 375-5095
    Attention: Stephen Roddenberry

or to such other address or Person as any party may have specified in a notice duly given to the other party as provided herein. Such notice, request, demand, waiver, consent, approval or other communication will be deemed to have been given as of the date so delivered.

    Section 11.6. <u>Amendment</u>. This Agreement shall not be amended, modified, revised, supplemented or terminated orally and no waiver of compliance with any provision hereof and no consent provided for herein shall be effective other than by a written instrument executed by SBT, Acquisition, the Company and the Stockholders' Representative.

    Section 11.7. <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (regardless of the laws that might

otherwise govern under applicable principles of conflicts of laws thereof) as to all matters, including, but not limited to, matters of validity, construction, effect, performance and remedies. Notwithstanding anything herein to the contrary, SBT, the Company, Acquisition and the Stockholders hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of New York and of the United States of America located in the State of New York (the "New York Courts") for any litigation arising out of or relating to this Agreement or the transactions contemplated hereby (and agrees not to commence counterclaims except in such courts), waives any objection to the laying of venue of any such litigation in the New York Courts and agrees not to plead or claim in any New York Court that such litigation brought therein has been brought in any inconvenient forum. Each Stockholder irrevocably appoints the Stockholders' Representative (or such successor person selected as Stockholders' Representative pursuant to this Agreement), with an address on the date hereof as set forth in Section 11.5, as their authorized agent to receive on behalf of such Stockholder, service of process which may be served in any action or proceeding arising out of or relating to this Agreement brought in the New York Courts. Such service may be made by mailing or delivering a copy of such process to the Stockholder care of the Stockholders' Representative at the Stockholders' Representative's address, and the Stockholder hereby irrevocably authorizes and directs the Stockholders' Representative to accept such service on its behalf.

Section 11.8.  Third Party Beneficiaries.  The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the parties hereto, and their respective successors and assigns, and they shall not be construed as conferring, and are not intended to confer, any rights on any other Person.

Section 11.9.  Performance.  In the event that a Party shall fail or refuse to consummate the transactions contemplated by this Agreement or any default under, or breach of, any representation, warranty or covenant of this Agreement on the part of a Party shall have occurred that results in the failure to consummate the transactions contemplated hereby, the Parties acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and accordingly the Parties agree that, in addition to any other remedies, the non-breaching party shall be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy. In addition, the non-breaching party shall be entitled to obtain from the breaching Party court costs and reasonable attorneys' fees incurred by it in enforcing their rights hereunder.

Section 11.10.  Severability.  If any term or other provision of this Agreement is determined to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms and provisions of the Agreement shall remain in full force and effect. Upon such determination, the parties hereto shall negotiate in good faith to modify this Agreement so as to give effect to the original intent of the parties to the fullest extent permitted by applicable law.

Section 11.11. Extensions.  At any time prior to the Closing Date, either party may by appropriate action, extend the time for compliance by or waive performance of any representation, warranty, agreement, condition or obligation of the other party.

Section 11.12. Section Headings.  All section headings are for convenience only and shall in no way modify or restrict any of the terms or provisions hereof.

Section 11.13. Exhibits; Disclosure Schedule.  All Exhibits referred to herein and the Disclosure Schedule are intended to be and hereby are specifically made a part of this Agreement.  Each exception to a representation or warranty of the Company that is set forth in the Disclosure Schedule or is identified by appropriate cross-referencing to, or has been grouped under a heading referring to, a specific individual Section of this Agreement and, except as otherwise specifically stated with respect to such exception in the Disclosure Schedule, relates only to such Section.

Section 11.14. Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and the Company, the Stockholders, SBT, and Acquisition may become a party hereto by executing a counterpart thereof.  This Agreement and any counterpart so executed shall be deemed to be one and the same instrument.  Delivery of an executed counterpart by facsimile transmission shall be as effective as delivery of a manually-executed counterpart hereof.

Section 11.15. Knowledge.  The representations and warranties in this Agreement, the Exhibits hereto and the Disclosure Schedule and any other Collateral Document shall in no event be affected by any investigation, inquiry or examination made for or on behalf of SBT or Acquisition or the knowledge of any of SBT's, Acquisition's or the Surviving Corporation's affiliates, officers, directors, shareholders, employees or agents or the acceptance by SBT or Acquisition of any certificate hereunder.

JUN 06 2001 14:44 FR SIEMENS MH MI      212 258 4545 TO 91&5555      P.02

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have duly executed this Agreement on the date first above written.

SIEMENS BUILDING TECHNOLOGIES, INC.

By: _____

Name: Stanley M. Kunka
Title: President and CEO

By: _____

Name: Fred J. Cardina
Title: Senior Vice- President Human
Resources

OCTANE ACQUISITION CORP.

By: _____

Name:  Richard J. Stark
Title:   President

SECURITY TECHNOLOGIES HOLDING
CORPORATION

By: _____

Name:
Title:

STOCKHOLDERS' REPRESENTATIVE

By: _____

Name:  Steven Sharpe

STOCKHOLDERS

By: _____

Name:

- 71 -

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have duly executed this Agreement on the date first above written.

SIEMENS BUILDING TECHNOLOGIES, INC.

By: _____
Name:
Title:

By: _____
Name:
Title:

OCTANE ACQUISITION CORP.

By: _____
Name:  Richard J. Stark
Title:  President

SECURITY TECHNOLOGIES HOLDING CORPORATION

By: _____
Name:
Title:

STOCKHOLDERS' REPRESENTATIVE

By: _____
Name:  Steven Sharpe

STOCKHOLDERS

By: _____
Name:
Title:

** TOTAL PAGE.03 **

JUN-07-01  05:46PM   FROM-AKERMAN SENTERFITT & EIDSON        +3053745095        T-278  P.02    F-132

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have duly executed this Agreement on the date first above written.

SIEMENS BUILDING TECHNOLOGIES, INC.

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

OCTANE ACQUISITION CORP.

By: _____
    Name:
    Title:

SECURITY TECHNOLOGIES HOLDING CORPORATION

By: _____
    Name: Mark Landis
    Title: CEO & Vice Chairman

STOCKHOLDERS' REPRESENTATIVE

By: _____
    Name: Steven Sharpe

STOCKHOLDERS

By: _____
    Name:
    Title:

- 69 -

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have duly executed this Agreement on the date first above written.

SIEMENS BUILDING TECHNOLOGIES, INC.

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

OCTANE ACQUISITION CORP.

By: _____
      Name:
      Title:

SECURITY TECHNOLOGIES HOLDING CORPORATION

By: _____
      Name:
      Title:

STOCKHOLDERS' REPRESENTATIVE

By: _____
      Name:  Steven Sharpe

STOCKHOLDERS

By: _____
      Name:
      Title:

- 70 -

Signature Page to Agreement and Plan of Merger
dated as of __________, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

____________________
ROBERT AIELLO
277 Park Avenue
New York, NY 10172

{MI565662;1}

JUN-07-01  05:46PM   FROM-AKERMAN SENTERFITT & EIDSON           +3053745095        T-278  P.05     F-132

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

**DANA BARSKY**
277 Park Avenue
New York. NY 10172

[M585902:2]

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

BARD PARTNERS, II, LLC

Richard Bard
Title:_____
Address:_____
_____
_____

{MISES902.2}

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein


RICHARD BARD
535 16th Street, Suite 920
Denver, CO 80202

[M[565902;2]]

JUN-07-01  05:46PM  FROM-AKERMAN SENTERFITT & EIDSON        +3053745095        T-278  P.08    F-132

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

CATALYST PARTNERS, LLC

Mark Landis

Mark Landis
Title: President
Address: 251 Crandon Blvd. TH161
Key Biscayne
Florida, 33149

{M3S#902;2}

JUN-07-01 05:46PM   FROM-AKERMAN SENTERFITT & EIDSON          +3053745095       T-278  P.09      F-132

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders Representative Identified Herein

ROBERT HENRY
277 Park Avenue
New York, NY 10172

dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

HUNT CAPITAL PARTNERS, L.P.

By:  Hunt Capital Group, L.L.C.
     Its General Partner

By:  _____
     J. R. Holland, Jr., President

Address:  1601 Elm Street
          Suite 4000
          Dallas, Texas 75201

(MI583902;3)

Signature Page to Agreement and Plan of Merger
dated as of _____ __, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

**INTERNATIONAL INSURANCE HOLDINGS**

*Mark Landis*

Mark Landis

Title: *Chairman*

Address: *261 Crandon Blvd. TH 161*

*Key Biscayne*

*Florida 33149*

{M1585902;2}

JUN-07-01  05:47PM    FROM-AKERMAN SENTERFITT & EIDSON          +3053745095          T-278  P.12    F-132

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

NAVEEN JEYAREDDI
277 Park Avenue
New York, NY 10172

Signature Page to Agreement and Plan of Merger
dated as of _____ __, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

ERIK JENSEN
277 Park Avenue
New York, NY 10172

{MI5B590221}

JUN-07-01 05:47PM    FROM-AKERMAN SENTERFITT & EIDSON    +3053745085    T-278  P.14    F-132

Signature Page to Agreement and Plan of Merger
dated as of _____ ___, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

ERIK JENSEN
277 Park Avenue
New York, NY 10172

[ML85900:2]

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

JULES KROLL
800 Third Avenue
New York, NY 10022

{M5853902;2}

JUN-07-01  05:47PM    FROM-AKERMAN SENTERFITT & EIDSON          +3053745005        T-278   P.16      F-132

Signature Page to Agreement and Plan of Merger
dated as of _____ __, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein


MARK LANDIS
1601 Sawgrass Corporate Parkway, Suite 400
Sunrise, FL 33323

{M585902;2}

JUN-07-01 05:47PM  FROM-AKERMAN SENTERFITT & EIDSON    +3053745095    T-278  P.17  F-132

Signature Page to Agreement and Plan of Merger
dated as of _____ __, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

JOHN LEE
277 Park Avenue
New York, NY 10172

JUN-07-01 05:47PM FROM-AKERMAN SENTERFITT & EIDSON        +3053745095        T-278  P.18  F-132

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

JOSIAH LOW
277 Park Avenue
New York, NY 10172

To Dana Bearsby

JUN-07-01  05:47PM    FROM-AKERMAN SENTERFITT & EIDSON          +3053745095          T-278   P.19    F-132

Signature Page to Agreement and Plan of Merger
dated as of May  31, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

DANIEL J. MACKELL
277 Park Avenue
New York, NY 10172

Signature Page to Agreement and Plan of Merger
dated as of _____ ___, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

**MARSHA PLOTNITSKY**
277 Park Avenue
New York, NY 10172

[MI585902:2]

JUN-07-01  05:47PM    FROM-AKERMAN SENTERFITT & EIDSON          +3053745095          T-278   P.21    F-132

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

JOSEPH ROSETTI
Address: 39 CRUE FOX RD
WESTON, CT. 06883

(M3193003.2)

JUN-07-01  05:47PM   FROM-AKERMAN SENTERFITT & EIDSON          +3053745095       T-278  P.22    F-132

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Securit - Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

RICHARD ROBETTI
900 Third Avenue
New York, NY 10022

JUN-07-01  05:47PM    FROM-AKERMAN SENTERFITT & EIDSON          +3053745095        T-278  P.23    F-132

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

DAVID WITTELS
277 Park Avenue
New York, NY 10172

JUN-07-01  05:47PM  FROM-AKERMAN SENTERFITT & EIDSON        +3053745085       T-278   P.24    F-132

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

_____

**STEVEN SHARPE**
134 Lyndhurst Avenue
Toronto, Ontario
M5R2Z9 Canada

{MI585902.2}

JUN-07-01  05:47PM    FROM-AKERMAN SENTERFITT & EIDSON              +3053745085              T-278    P.25    F-132

Signature Page to Agreement and Plan of Merger
dated as of ___6/6___, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

RICHARD ABRAMS
Address: ___4545 E. 9th___
___Denver CO 80820___

{MI3859022}

JUN-07-01 05:48PM    FROM-AKERMAN SENTERFITT & EIDSON                +3053745085         T-278  P.27    F-132
JUN-05-01 09:58 FROM-B R + A

Signature Page to Agreement and Plan of Merger
dated as of _____ 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

EUGENE BARD
Address:  40 BATTERY ST APT 309
          BOSTON
          Massachusetts 02109

(MI5889922:2)

JUN-07-01  05:48PM  FROM-AKERMAN SENTERFITT & EIDSON          +3053745095          T-278  P.28      F-132

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

**RICHARD BARD FAMILY FOUNDATION**

By: _____
Title: _____
Address: _____
_____
_____

(M1585902;2)

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

_____, Custodian
for

**MELISSA BARD**
Address:_____
_____
_____

(MI585902;2)

JUN-07-01  05:48PM   FROM-AKERMAN SENTERFITT & EIDSON           +3053745085         T-278  P.30    F-132
JUN-07-2001  14:48

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

HILARY GREENE
Address: _____
         _____
         _____

(0303470303)

JUN-07-01  05:48PM   FROM-AKERMAN SENTERFITT & EIDSON              +3053745095            T-278   P.31     F-132
            06/05/2001  11:46   3035222005                                                         .
            JUN- 4-01 MON  4:44 PM   GREYSTONE                    FAX NO.  305 874 6390           P. 7

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

MARTIN HART
Address:  2401 E. 2nd Ave., Suite 250
          Denver, CO  80206

JUN-07-01  05:48PM   FROM-AKERMAN SENTERFITT & EIDSON         +3053745095        T-278  P.32   F-132
   Jun 04 01 06:11p                                        FAX NO  303 574 8390        P  7
     JUN- 4-C1 MON  5:16 PM  CEASTONE

Signature Page to Agreement and Plan of Merger
dated as of _____ 6, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

ARNOLD HAYUTIN
Address  2190 S. HERON WAY
        DENVER Co 80231

(M513902:1)

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

*[signature]*

SHIRLEY HIGGS
Address: 320 Cottonwood Dr
Evergreen CO
80439

{MI5X5902;2}

JUN-07-01 05:48PM  FROM-AKERMAN SENTERFITT & EIDSON                +3053745005        T-278  P.34/85  F-132
         86/05/2001  10:18   383-753-5937
         04/06/01  22:41  FAX 0577-270854        SCAOCIATE(RS)ERI                                @03
         86/04/2001  14:38   383-753-5937        LIHF GHATRAN PC                          PAGE  03/04

Signature Page to Agreement and Plan of Merger
dated as of _____ 2001
by and among Siemens Building Technologies, Inc., Ozono Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

CHARLES JACOBI
Address: _650 in Cherry St_
_4900_
_Denver, CO 80176_

(24159716[3])

JUN-07-01  05:48PM   FROM-AKERMAN SENTERFITT & EIDSON          +3053745085        T-278   P.35/95   F-132
06/03/2001 TUE 05:16 FAX
JUN- 4-01 MON  5:01 PM   GREYSTOKE                    FAX NO.    303 874 0330

Signature Page to Agreement and Plan of Merger
dated as of _June 8_, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

*Edward J. Meier*

EDWARD MEIER
Address: _3924 So. Holly Way_
_Englewood, CO. 80110_

{N0585902;2}

JUN-07-01  05:48PM    FROM-AKERMAN SENTERFITT & EIDSON          +3053745085        T-278   P.36/85   F-132

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein


_____
GERALD MELFI
Address: 11203 E. Colorado Dr
Aurora, CO 80012

{MI585902.2}

JUN-07-01  05:48PM    FROM-AKERMAN SENTERFITT & EIDSON          +3053745095        T-270  P.37/85  F-132
Jun-07-01  05:59A  GEU/7IVAN ERAEV AND  KAR          +3053745095        T-270  P.37/85  F-132
JUN-05-01 TUF 14:58       IDEASPRING LLC             FAX NO. 3055513001            P. 10

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

O'SULLIVAN GRAEV & KARABELL, LLP
PROFIT SHARING PLAN (FBO CERTAIN
PARTNERS)

By _____
Title _____
Address _____
       _____

[NYDK690232]

JUN-07-01  05:48PM   FROM-AKERMAN SENTERFITT & EIDSON          +3053745005          T-278  P.38/85  F-132
      05/05/2001   11:49   3053455628          SENTOFIED
      JUN-05-01 TUE 10:08   IDEASPRING LLC   _          FAX NO. 3039913001          P. 03

Signature Page to Agreement and Plan of Merger
dated as of _July 5_, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

RICHARD BARD CHILDREN'S TRUST

Richard Bard
Title: TRUSTEE
Address: 2150 S. ALMA WAY
DENVER, CO 80223

[N11629072]

JUN-07-01 05:48PM FROM-AKERMAN SENTERFITT & EIDSON        +3053745095        T-278  P.38/95  F-132
06/06/2001  00:47  21444002..3
JUN- 4-01 MON  5:09 PM  GREYSTONE                   FAX NO.  303 674 5999              2. 7

Signature Page to Agreement and Plan of Merger
dated as of _June 5_, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

WILLIAM TAUSCHER
Address:

{M5B5902;2}

JUN-08-01  05:50PM  FROM-                                    T-292  P.03   F-487

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

In addition to executing and agreeing to the Merger Agreement, by signing below, MCI Telecommunications Corporation acknowledges and agrees that the transactions contemplated by the Merger Agreement do not give rise to any termination right granted to MCI pursuant to Section 18.2 (Termination Upon Change of Control) of the Monitoring & Systems Services Agreement between MCI Telecommunications Corporation and GTI Holding Corporation dated February 28, 1997.

MCI WORLDCOM NETWORK SERVICES, INC.
formerly known as MCI Telecommunications Corporation

By _____
     Susan Mayer
Its _____SVP_____
Address:    1133 19th Street, NW
        Washington, DC  20036

JUN-08-01  05:50PM  FROM-                                    T-282  P.04/33  F-487

Signature Page to Agreement and Plan of Merger
dated as of _____, 2001
by and among Siemens Building Technologies, Inc., Octane Acquisition Corp.,
Security Technologies Holding Corporation, the Stockholders Party Hereto and the
Stockholders' Representative Identified Herein

JOE ROSETTI
Address: 39 CROOKED RD
         CRESTON, CT
                  06883

IMI664473-11

**B**

**Robert H. Lang**
Direct Dial: (312) 580-2237
Direct Fax: (312) 782-1747
E-mail: rlang@fagelhaber.com


August 29, 2005


**Via Fax No: (416) 368-3752**
Mr. Steven Sharpe
Blair Franklin Capital Partners Inc.
26 Wellington Street East
Suite 610
Toronto, ON  M5E 1S2
Canada


Re:   **Siemens AAA Demand**
       Case No: 50-180-T-00275-05
       Our File No: 643310.1010

Dear Mr. Sharpe:

As you know, we represent Siemens Building Technologies, Inc. ("SBT").  On behalf of our client, we are seeking your waiver in the following items.  Reference is made to the Agreement and Plan of Merger (the "Agreement") entered into by and among SBT, Octane Acquisition Corp. ("Acquisition"), Security Technologies Holding Corporation (the "Company"), the Stockholders and the Stockholders' Representative, Steven Sharpe on June 8, 2001 (SBT, Acquisition, the Company, the Stockholders and the Stockholders' Representative are sometimes referred to collectively as the "Parties").  Section 7.7 (d) of the Agreement provides for arbitration of all disputes as follows:

> (d)    The Commercial Arbitration Rules of the AAA, revised and effective July 1, 1996, as modified or revised by the provisions of this Section 7.7, shall govern any arbitration proceeding hereunder.  The arbitration shall be conducted by three arbitrators selected pursuant to Rule 13 of the Commercial Arbitration Rules, and pre-hearing discovery shall be permitted if and only to the extent determined by the arbitration to be necessary in order to effectuate resolution of the matter in dispute.  The arbitrator's decision shall be rendered within 30 days of the conclusion of any hearing hereunder and the arbitrator's judgment and award may be entered and enforced in any court of competent jurisdiction.

By your signature below, you, as Stockholders Representative and on behalf of the Stockholders, hereby agree to submit American Arbitration Association case No: 50-180-t-00275-05 to a single arbitrator rather than three arbitrators and waive any right to insist that an arbitration be

Mr. Steven Sharpe
August 24, 2005
Page 2

conducted by three arbitrators. Additionally, by your signature below, you acknowledge that you
are the Stockholders' Representative and that you have the power and authority to assent to this
waiver of certain rights conferred by the Agreement on behalf of the Stockholders.

Please acknowledge your acceptance of the foregoing by signing a copy of this letter where
indicated below. We will then direct the appropriate SBT representative to sign this waiver and
we will provide you with an original. Thank you.

Very truly yours,


Robert H. Lang

RHL:JLO:sf

cc:    Mark W. Stoutenburg, Esq.

Accepted by: _____   Dated: _____
              Steven  Sharpe,
              Stockholders' Representative


Accepted by: _____   Dated: _____
              Siemens Building Technologies, Inc.

444671-2

**C**

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

In the Matter of the Arbitration between:


Re: 50 180 T 00275 05
    Siemens Building Technologies, Inc.
    vs
    Robert Aiello
    Melissa Bard
    Richard Bard
    Dana Barsky
    International Insurance Holdings Corp.
    Richard Bard Family Foundation
    Robert Henry
    Erik Jensen
    Jules Kroll
    Mark Landis
    John Lee
    Bard Partners, II, LLC
    Joshiah Low
    Daniel J. Mackell
    Naveen Jeereddi
    Catalyst Partners, LLC
    Crystal Lakes Limited Partnership
    Marsha Plotnitsky
    Richard Rosetti
    Steven Sharpe
    David Wittels
    Hunt Capital Partners, L.P
    Alexander Bard

---

### AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated June 8, 2001, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, AWARD, as follows:

1.   Within thirty (30) days from the date of transmittal of this Award to the Parties, each of the individually named respondents, in the percentages shown severally and not jointly for each below (hereinafter referred to collectively as "RESPONDENTS"), shall pay to Siemens Building Technologies, Inc. (hereinafter referred to as "CLAIMANT"), the sum of $1,057,513.39, plus interest on that sum at the rate of six per cent (6%) per annum from May 17, 2007 until paid.

2.  The administrative fees and expenses of the International Centre for Dispute Resolution ("ICDR") totaling $8,750.00 shall be borne severally by RESPONDENTS, and the compensation and expenses of the arbitrator totaling $15,732.00 shall be borne severally by RESPONDENTS. Therefore, RESPONDENTS, in the percentages shown severally and not jointly for each below, shall reimburse CLAIMANT the sum of $16,491.00, representing that portion of said fees and expenses previously incurred by CLAIMANT, upon demonstration by CLAIMANT that these incurred costs have been paid.

3.  Each respondent shall be liable for the proportion of the total Award, costs, fees and continuing interest set forth below:

Robert Aiello – 0.22157147%

Bard Partners, II, LLC – 9.46937303%

Richard Bard – 7.91210998%

Dana Barsky – 0.13292129%

Catalyst Partners, LLC – 1.15256038%

Robert Henry – 0.08854221%

Hunt Capital Partners, L.P – 7.44823520%

International Insurance Holdings – 2.39690232%

Erik Jensen – 0.11067%

Naveen Jeeredi - 0.04433%

Jules Kroll – 48.51432%

Mark Landis – 7.63508%

John Lee – 0.13279%

Josiah Low – 1.01909920%

Daniel J. Mackell – 0.13292129%

Marsha Plotnitsky -- 1.01807%

Crystal Lakes Limited Partnership – 5.37253%

Richard Rosetti – 4.49242%

David Wittels – 0.28779%

Steven Sharpe – 2.15738%

The Bard Foundation – 0.08274%

Alexander Bard – 0.05340%

Melissa Bard – 0.05340%

4. This award is in full settlement of all claims and counterclaims submitted to this Arbitration.

I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

_July 10, 2007_
_____
Date

_Richard K. Jeydel_
_____
Richard K. Jeydel, Esq.

State of New York

County of New York
} SS:

I, Richard K. Jeydel, Esq., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_July 10, 2007_
_____
Date

_Richard K. Jeydel_
_____
Richard K. Jeydel, Esq.